STATE v. ATLANTIC ICE & COAL COMPANY, TRADING AS CRYSTAL ICE & COAL COMPANY.

(Filed 25 November, 1936.)

**1. Criminal Law I j—On motion to nonsuit, all incriminating evidence on whole record is to be considered in light most favorable to the State.**

On a motion to nonsuit in a criminal prosecution, all the incriminating evidence on the whole record is to be taken in its most favorable light for the State, and only the incriminating evidence should be considered, and the State is entitled to every reasonable inference therefrom and every reasonable intendment thereon. C. S., 4643.

**2. Criminal Law I i—**

The competency, admissibility, and sufficiency of evidence is for the court to determine, the weight, effect, and credibility is for the jury.

**3. Criminal Law L f—**

Where a defendant is convicted on two counts of equal gravity and punishment, and no error is found in regard to the trial on one of the counts, exceptions not affecting such count, but relating solely to the other count need not be considered, since error, if any, in regard thereto would be immaterial.

**4. Criminal Law I k—**

Where a verdict of guilty specifically refers to some of the counts, but not to all, it amounts to an acquittal on the counts not referred to.

**5. Monopolies A a: Statutes A d—C. S., 2563 (3), relating to monopolies, held constitutional and not void for indefiniteness.**

C. S., 2563 (3), sufficiently defines the offense therein prohibited as the willful destruction or undertaking to destroy the business of any opponent or business rival in the State with the purpose or intention of attempting to fix the price of anything of value when competition is removed, and the statute is constitutional and clear and is not void for indefiniteness, the State having the power to regulate discriminatory sales unless the statute contravenes the Federal Constitution.

**6. Monopolies C b—Evidence of defendant's violation of C. S., 2563 (3), held sufficient to be submitted to the jury.**

Evidence that defendant, a foreign corporation, operated coal yards in several cities of this State, that in one of its yards it put down the price

of coal below the cost of handling, and that its manager, when advised by the secretary of the coal dealers' association of the city that its practices would be ruinous to other dealers in the city, replied that it had to sell the tonnage in that.city and that there were too many coal dealers operating in the city anyway, that its prices in the city were lower than its prices in another city in the State, that by so cutting its price it doubled its volume of business in the city, and that it sold almost three times the tonnage of its largest competitor, with other direct and circumstantial evidence, *is held* sufficient to be submitted to the jury on the issue of defendant's violation of C. S., 2563 (3), the question of whether defendant willfully undertook to injure its competitors' businesses and intended to raise the price of coal after competition had been removed being for the jury to determine from all the facts and circumstances adduced at the trial, and defendant's motion to nonsuit was correctly denied. N. C. Constitution, Art. I, secs. 7, 31.

**7. Criminal Law G i—Coal dealer of long experience held competent to give opinion as to cost of handling coal.**

In this prosecution for violation of C. S., 2563 (3), relating to monopolies, the State was allowed to introduce the testimony of coal dealers in the same city as to the cost of handling coal, the opinion testimony being based upon complicated and detailed facts relating to costs of buying, shipping, trucking, handling, shrinkage, labor, repairs, etc., the witnesses having had years of experience in operating their respective businesses in the city. *Held:* The witnesses were experts and their opinion testimony was competent and was properly received in evidence.

**8. Same—**

Where expert testimony is admitted in evidence, it will be presumed that the court made a preliminary finding that the witnesses were experts, or that such finding was waived, and an exception to the testimony for that the record fails to show such preliminary finding cannot be sustained.

**9. Monopolies C c—Instruction in this prosecution for violation of C. S., 2563 (3), held without error.**

In a prosecution for violating C. S., 2563 (3), relating to monopolies, an instruction that a person violates this section if he lowers the price of the product in question for the purpose of injuring or destroying competitors, and then, after competition is removed, he sells at a higher price to the detriment of the public, *is held* without error.

**10. Same: Criminal Law A c—Instruction defining willfulness held without error.**

In this prosecution for violation of C. S., 2563 (3), relating to monopolies, the court's instruction defining the element of willfulness in injuring the business of competitors that willful means the wrongful doing of an act without justification or excuse, *is held* a correct definition of willfulness as used in criminal statutes, nor will the court's failure to explain the meaning of "justification" as used in the instruction be held for error in the absence of a request for special instructions, it appearing that elsewhere in the charge the court, in effect, explained the word by charging that defendant could not be found guilty unless defendant intended to injure its competitors and fix prices after competition was removed.

**11. Criminal Law I g—**

The failure of the court to elaborate on a subordinate feature of the charge will not be held for error in the absence of a request for special instructions.

**12. Same—**

The charge in this case *held* not to impinge on C. S., 564, it appearing that the court, in a clear and logical way, set forth the facts and gave the contentions of both parties in a fair manner, and charged the law applicable to the facts and clearly defined "reasonable doubt."

STACY, C. J., dissents.

APPEAL by defendant from *Clement, J.,* and a jury, at January Term, 1936, of FORSYTH. No error.

The defendant was indicted under the following bill of indictment: "The jurors for the State, upon their oath present, that the Atlantic Ice & Coal Company, a corporation organized and existing in the State of Georgia and doing business in the city of Winston-Salem, Forsyth County, on or about the 14th day of November, 1935, with force and arms, at and in the county aforesaid, unlawfully, willfully did undertake to destroy and injure the business of Consumers Coal Corp., George Agee, Barnes Coal Co., Carroll Coal Co., Dixie Coal Co., Drew & Tolley, Minnis Coal Co., Realty Bond Coal Co., Service Coal Co., and I. C. Yates Fuel Co., and others, the opponents and business rivals of the said Atlantic Ice & Coal Company, Inc., in the State of North Carolina, with the purpose and intention of attempting to fix the price of coal, a commodity of value, when the competition is removed in violation of section 2563, subsection 3, of the Consolidated Statutes, against the form of the statute in such case made and provided and against the peace and dignity of the State. And the jurors aforesaid, upon their oath, do further present, That the Atlantic Ice & Coal Company, a corporation organized and existing in the State of Georgia and doing business in the city of Winston-Salem, Forsyth County, on or about the 14th day of November, 1935, with force and arms, at and in the county aforesaid, unlawfully, willfully did buy and sell within the State, through its agent, E. W. Goodman, coal, a thing of value, which is sold and bought in the State of North Carolina, to injure and destroy the business of Consumers Coal Corp., George Agee, Barnes Coal Co., Carroll Coal Co., Dixie Coal Co., Drew & Tolley, Minnis Coal Co., Realty Bond Coal Co., Service Coal Co., and I. C. Yates Fuel Co., and others, the rivals and opponents of Atlantic Ice & Coal Company, by lowering the price of said coal sold, so low as to leave an unreasonable and inadequate profit for a time with the purpose of increasing the profit on the business when such rivals and opponents are driven out of business or the business of said opponents is injured in violation of section 2563, subsection 4, of Consolidated Stat-

utes, against the form of the statute in such case made and provided and against the peace and dignity of the State. And the jurors, aforesaid, upon their oath do further present, That the Atlantic Ice & Coal Company, a corporation organized and existing in the State of Georgia and doing business in the city of Winston-Salem, Forsyth County, on or about the 14th day of November, 1935, with force and arms, at and in the county aforesaid, who deals in coal, a thing of value, within the State of North Carolina, did unlawfully and willfully sell, at and in the city of Winston-Salem, a place where there is competition, said coal at a price lower than is charged by said Atlantic Ice & Coal Company for the same thing, to wit: the same or similar coal at another place, to wit: in the city of Charlotte, North Carolina, where there is not good and sufficient reason, on account of transportation or the expense of doing business, for charging less at the one place than the other, with the view of injuring the business of Consumers Coal Corp., George Agee, Barnes Coal Co., Carroll Coal Co., Dixie Coal Co., Drew & Tolley, Minnis Coal Co., Realty Bond Coal Co., Service Coal Co., and I. C. Yates Fuel Co., and others, rivals and opponents of Atlantic Ice & Coal Company, against the form of the statute in such case made and provided and against the peace and dignity of the State.          GWYN, *Solicitor.*"

It is stipulated by the defendant that the Atlantic Ice & Coal Company is a corporation, organized and existing under the laws of the State of Georgia. It is further stipulated that the Atlantic Ice & Coal Company does business in the city of Winston-Salem, under the trade name of "Crystal Ice & Coal Company," and that the Crystal Ice & Coal Company is not a corporation.

A motion to quash was sustained as to the second count, on the ground that subsection 4 of C. S., 2563, was so indefinite that its enforcement would violate the due process clause of the Federal and State constitutions. Judgment as of nonsuit was rendered as to the defendant Goodman, manager of the Crystal Ice & Coal Company, and the corporate defendant was tried only upon the first and third counts. The defendant entered a plea of not guilty. The jury returned a verdict of guilty upon both of those counts, and the defendant company was fined $1,000 and costs.

The defendant made numerous exceptions and assignments of error, and appealed to the Supreme Court. The material ones and necessary facts will be set forth in the opinion.

*Attorney-General Seawell and Assistant Attorneys-General McMullan and Bruton, and W. T. Wilson for the State.*

*W. M. Hendren and W. P. Sandridge, Jr., of Manly, Hendren & Womble for defendant.*

CLARKSON, J. The defendant, at the close of the State's evidence and at the close of all the evidence moved to dismiss the action or for judgment of nonsuit. C. S., 4643. The court below denied the motions, and in this we can see no error. Was there sufficient evidence of defendant's guilt to be submitted to the jury? We think so.

"On motion to dismiss or judgment of nonsuit, the evidence is to be taken in the light most favorable to the State, and it is entitled to the benefit of every reasonable intendment upon the evidence and every reasonable inference to be drawn therefrom. 'An exception to a motion to dismiss in a criminal action taken after the close of the State's evidence, and renewed by defendant after the close of his own evidence, does not confine the appeal to the State's evidence alone, and a conviction will be sustained under the second exception if there is any evidence on the whole record of the defendant's guilt.' *S. v. Earp,* 196 N. C., at p. 166. See *S. v. Carlson,* 171 N. C., 818; *S. v. Sigmon,* 190 N. C., 684. The evidence favorable alone to the State is considered—defendant's evidence is discarded. *S. v. Utley,* 126 N. C., 997. The competency, admissibility, and sufficiency of evidence is for the court to determine, the weight, effect, and credibility is for the jury. *S. v. Utley, supra; S. v. Blackwelder,* 182 N. C., 899." *S. v. Lawrence,* 196 N. C., 562 (564).

N. C. Code, 1935 (Michie), sec. 2559, is as follows: "Every contract, combination in the form of trust or otherwise, or conspiracy in restraint of trade or commerce in the State of North Carolina is hereby declared to be illegal. Every person or corporation who shall make any such contract expressly, or shall knowingly be a party thereto by implication, or who shall engage in any such combination or conspiracy, shall be guilty of a misdemeanor, and upon conviction thereof such person shall be fined or imprisoned, or both, in the discretion of the court, whether such person entered into such contract individually or as an agent representing a corporation, and such corporation shall be fined in the discretion of the court not less than one thousand dollars."

Section 2563: "In addition to the matters and things hereinbefore declared to be illegal, the following acts are declared to be unlawful, that is, for any person, firm, corporation, or association, directly or indirectly, to do or to have any contract, express or knowingly implied, to do any of the acts or things specified in any of the subsections of this section. . . . (3) To willfully destroy or injure, or undertake to destroy or injure, the business of any opponent or business rival in the State of North Carolina with the purpose or intention of attempting to fix the price of anything of value when the competition is removed. (4) Who, directly or indirectly, buys or sells within the State, through himself or itself, or through any agent of any kind, or as agent or princi-

pal, or together with or through any allied, subsidiary, or dependent person, firm, corporation, or association, any article or thing of value which is sold or bought in the State to injure or destroy or undertake to injure or destroy the business of any rival or opponent, by lowering the price of any article or thing of value sold, so low, or by raising the price of any article or thing of value bought, so high as to leave an unreasonable or inadequate profit for a time, with the purpose of increasing the profit on the business when such rival or opponent is driven out of business, or his or its business is injured. (5) Who deals in any thing of value within the State of North Carolina, to give away or sell, at a place where there is competition, such thing of value at a price lower than is charged by such person, firm, corporation, or association for the same thing at another place, where there is not good and sufficient reason, on account of transportation or the expense of doing business, for charging less at the one place than at the other, with the view of injuring the business of another."

Section 2564: "Any corporation, either as agent or principal, violating any of the provisions of preceding section shall be guilty of a misdemeanor, and such corporation shall, upon conviction, be fined not less than one thousand dollars for each and every offense, and any person, whether acting for himself or as officer of any corporation or person violating any of the provisions of this chapter, shall be guilty of a misdemeanor, and, upon conviction, shall be fined or imprisoned, or both, in the discretion of the court."

Section 2566: "Where the things prohibited in this chapter are continuous, then, in such event, after the first violation of any of the provisions hereof, each week that the violation of such provision shall continue shall be a separate offense."

Constitution of North Carolina, Art. I, sec. 7, is as follows: "No man or set of men are entitled to exclusive or separate emoluments or privileges from the community but in consideration of public service."

Section 31: "Perpetuities and monopolies are contrary to the genius of a free state and ought not to be allowed."

One of the best definitions of "monopoly" which can be found is in Black's Law Dictionary (3d Ed.), p. 1202: "A monopoly consists in the ownership or control of so large a part of the market supply or output of a given commodity as to stifle competition, restrict the freedom of commerce, and give the monopolist control over prices," citing a long list of authorities.

The word "monopoly" is defined in *Commonwealth v. Dyer*, 243 Mass., 472: "In the modern and wider sense monopoly denotes a combination, organization, or entity so extensive and unified that its tendency is to suppress competition, to acquire a dominance in the market, and to

secure the power to control prices to the public harm with respect to any commodity which people are under a practical compulsion to buy."

Regulating discriminatory sales made within the State for the purpose of destroying competition is within the legislative power of the State, unless the statute conflicts with the Constitution of the United States. *Central Lumber Co. v. State of South Dakota,* 226 U. S., 157.

In Fletcher's Cyc. Corporations (Permanent Ed.), Vol. 10, ch. 56, part of sec. 5016, p. 850, it is said: "Ruinous competition by lowering prices has been recognized as an illegal medium of eliminating weaker competitors," citing many authorities. *Porto Rican Amer. Tobacco Co. v. Amer. Tobacco Co.,* 30 Fed. Reporter, 234 (236); *Standard Oil Co. v. U. S.,* 221 U. S., 1; *U. S. v. Amer. Tobacco Co.,* 221 U. S., 106.

Wharton's Criminal Law, Vol. 3, 12th Ed. (1932), sec. 2230, is as follows: "In the closing years of the 19th century and early part of the 20th, statutes were enacted in nearly all states and by Congress with a design to restrain the evils of complete monopoly. This class of laws has been sustained in principle as to both civil and criminal features. They were leveled at contracts, combinations, and conspiracies in restraint of trade that had been declared to be against public policy and void under the common law before the passage of such new statutes. The language of the statutes need be supplemented by allegations as to the facts. Conspiracy to combine as well as the actual coöperation to monopolize is forbidden. The exaction of excessive prices upon the sale of necessaries was forbidden in the United States as in various countries during the World War. The criminal part of the act failed for indefiniteness."

*Chief Justice White,* in *Standard Oil Co. v. United States,* 221 U. S., 1 (at p. 58), says for the Court: "Without going into detail, and but very briefly surveying the whole field, it may be with accuracy said that the dread of enhancement of prices and of other wrongs which it was thought would flow from the undue limitation on competitive conditions, caused by contracts or other acts of individuals or corporations, led, as a matter of public policy to the prohibition, or treating as illegal all contracts or acts which were unreasonably restrictive of competitive conditions, either from the nature or character of the contract or act, or where the surrounding circumstances were such as to justify the conclusion that they had not been entered into or performed with the legitimate purpose of reasonably forwarding personal interest and developing trade, but, on the contrary, were of such character as to give rise to the inference or presumption that they had been entered into or done with the intent to do wrong to the general public and to limit the right of individuals, thus restraining the free flow of commerce and tending to

bring about the evils, such as enhancement of prices, which were considered to be against public policy." *S. v. Craft,* 168 N. C., 208 (210-211).

The defendant was tried on the 1st and 3d counts in the bill of indictment and convicted on both.

In *S. v. Toole,* 106 N. C., 736 (738-9), it is said: "There having been a general verdict of guilty on two counts, for offenses punishable alike, it is immaterial to consider, as to the other count, whether there was error committed or not, unless it was such error as might or could effect the verdict of guilty on the second count. . . ˙ . If it is a general verdict of guilty upon an indictment containing several counts, charging offenses of the same grade, and punishable alike, the verdict upon any one, if valid, supports the judgment, and it is immaterial that the verdict as to the other counts is not good, either by reason of defective counts, or by the admission of incompetent evidence, or giving objectionable instructions as to such other counts, provided the errors complained of do not affect the valid verdict rendered on this count." *S. v. Newton,* 207 N. C., 323 (328).

Where a verdict refers to only one of several counts in an indictment, it amounts to an acquittal upon counts not referred to. *S. v. Hampton, ante,* 283 (284).

We will consider only the count on which defendant was convicted. C. S., 2563 (3), *supra.* The ingredients (1) to willfully destroy or injure, or undertake to destroy or injure; (2) the business of any opponent or business rival in the State of North Carolina; (3) with the purpose or intention of attempting to fix the price of anything of value; (4) when the competition is removed.

It is well settled in this jurisdiction that an act may be void for uncertainty, vagueness, or indefiniteness. *S. v. Morrison, ante,* 117 (120-1).

In *Nash v. United States,* 229 U. S., 373 (377), we find: "But, apart from the common law as to restraint of trade thus taken up by the statute, the law is full of instances where a man's fate depends on his estimating rightly, that is, as the jury subsequently estimates it, some matter of degree. If his judgment is wrong, not only may he incur a fine or short imprisonment," etc. At page 378, citing authorities: "As to the suggestion that the matters alleged to have been contemplated would not have constituted an offense if they had been done, it is enough to say that some of them conceivably might have been adequate to accomplish the result, and that the intent alleged would convert what on their face might be no more than ordinary acts of competition or the small dishonesties of trade into a conspiracy of wider scope, as has been explained more than once."

We think the act not uncertain, vague, or indefinite. The statute is clear and not ambiguous, and we think constitutional.

Let us now examine the evidence to see if it was sufficient to be submitted to the jury.

(1) The Atlantic Ice & Coal Company is (T/A) trading as the Crystal Ice & Coal Company in Winston-Salem, N. C. The Atlantic Ice & Coal Company has about fifty different branches scattered over seven Southern States. It is managed by an Atlanta board of directors, of which F. W. Beazley is president, and high officials in banks and service corporations. The company does business in Charlotte, Lexington, Salisbury, Albemarle, Statesville, Spencer, and other places in North Carolina. It does an ice and coal business in Winston-Salem and is the largest dealer in coal. There are some twenty-five coal dealers in Winston-Salem. E. W. Goodman was manager of the Winston-Salem branch of the Atlantic Ice & Coal Company.

(2) J. R. Tolley, a witness for the State, testified, in part: "I talked with Mr. Beazley over the telephone. I asked him if it was his instructions to sell coal at the prices Mr. Goodman had quoted me and he said that it was. I told him these prices were below cost and I did not see how anyone could sell at those prices. He said what he wanted to do was to get more tonnage here. I asked him if there was anything we could do to bring about an adjustment, whether there was anything the coal dealers had done to cause him to take such steps as that. He said it was not. I asked him if there was anything we could do to cause an adjustment so he could step his prices up to where we could compete. He said there wasn't. I told him we couldn't compete and stay in business. I told him there were a lot of small dealers who could not compete with these prices; and if we met his prices we would be put out of business, and if we didn't meet them he would get the majority of the business and that would decrease our business. He said what they wanted was tonnage, and there were too many coal dealers in Winston-Salem anyhow. This conversation was on the afternoon of the same day that Mr. Goodman told me he was going to cut the prices, that was 7 November, 1935, the day before the prices were cut. I am president of the Retail Coal Association. In the telephone conversation I told Mr. Beazley that we could not meet his prices and stay in business, and if we did not meet his prices it would decrease our business so we could not stay in business and that there were a lot of small coal dealers here. I also told him they depended on nothing but a living out of the coal business, and it just meant meat and bread to them, and if he couldn't think of the human side and adjust things so that we might operate and make a living. He stated he didn't think what he was doing was hurting anybody; that what he wanted was tonnage and that was what

he was going to have, and there were too many coal dealers in Winston-Salem, anyhow."

(3) T. W. Minnis testified, in part: "I am connected with the Minnis Coal Company, which has been in business in Winston-Salem since October, 1930. I have been in the coal business in Winston-Salem since 1914, with the exception of two years. . . . I had a conversation with Mr. Goodman, who is manager of the Winston-Salem plant in August, 1935. I talked to Mr. Goodman about general business conditions in the town. I told him I was losing some business on account of being undersold. He said, 'Something is liable to break loose here some day and when it is over with there won't be so many coal dealers in town as there are now.'"

(4) The cut by the Atlantic Ice & Coal Company went into effect on 8 November, 1935. At the time the advertisement of the cut published in the Winston-Salem papers cost $696.00. The defendant, after the price-cut in November, 1935, sold 4,195 tons of coal against 2,044 tons in November, 1934. In December, 1935, defendant sold 6,322 tons of coal against 2,936 tons in December, 1934.

(5) Although a member of the Retail Coal Association, which consists of practically all the coal dealers in Winston-Salem, Goodman did not discuss with the coal dealers the change of policy.

(6) Higher prices in Charlotte than in Winston-Salem.

(7) The defendant's volume amounts to some twenty thousand tons a year. The next largest dealer sells from seven thousand to eight thousand tons, the others selling from one thousand to fifteen hundred tons per year.

(8) J. R. Tolley stated that he had tried to persuade Mr. Goodman and Mr. Beazley, president of the company, not to make this cut. There was other evidence, direct and circumstantial.

J. R. Tolley testified: "I have been a coal dealer in Winston-Salem about nine and one-half years and am familiar with the coal business in this city. I know approximately what it costs me to handle coal. I am familiar with the equipment used in handling coal and the general expenses of handling coal in Winston-Salem. Q. State to his Honor and the jury whether or not in your opinion coal may be handled at a profit in Winston-Salem at the published prices of the Atlantic Ice & Coal Company, prices having been published since 8 November. Ans.: No, sir. Q. I understand by that, then, in your opinion, those prices are below the costs of handling? Ans.: Yes, sir. Q. How much below? Ans.: I would say they would have to get at least on some of those grades, selling, have to get from $1.00 to $1.50 more than what they are getting would be at cost." The defendant excepted and assigned error.

There was much evidence along this same line, to which the defendant excepted and assigned error—none of them can be sustained.

In *Britt v. R. R.,* 148 N. C., 37 (41), is the following: "5 Encyc. Ev., 654, summarizes the decisions thus: 'The exception to the general rule that witnesses cannot give opinions is not confined to the evidence of experts testifying on subjects requiring special knowledge, skill, or learning, but it includes the evidence of common observers testifying the results of their observations made at the time in regard to common appearances, facts, and conditions which cannot be reproduced and made palpable to the jury,' citing, among other cases, *S. v. Edwards,* 112 N. C., 901. This is a clear statement of well settled principle, and is a common-sense restriction which keeps the wise general rule as to 'opinion' and 'expert' evidence from degenerating into absurdity." *Kepley v. Kirk,* 191 N. C., 690 (694).

"Where an inference is so usual, natural, or instinctive as to accord with general experience, its statement is received as substantially one of fact—part of the common stock of knowledge." 22 C. J., p. 530, citing numerous North Carolina cases.

In the instant case, since the witnesses were coal dealers of long standing in Winston-Salem, and since they had had long experience in the coal business there, and were in close touch with conditions, and hence were acquainted with the detailed and complicated facts relating to costs of buying coal from the mines, shipping, trucking, handling, shrinkage, labor, repairs, etc., they were qualified as experts, and their opinions were properly received. *Belding v. Archer,* 131 N. C., 287; *Davenport v. Norfolk R. R.,* 148 N. C., 287; *May Co. v. Shoe Co.,* 186 N. C., 144. See 22 Corpus Juris, page 680; 3 Chamberlayne Evidence, page 2383. Nor will the admissions of the opinions of the coal dealers constitute error for the reason that the record does not show that the court below made a preliminary finding that they were experts. Where expert testimony is admitted in evidence, the presumption is that the preliminary finding was made, or that the point was waived. *S. v. Gray,* 180 N. C., 697; *S. v. Hightower,* 187 N. C., 307; *Shaw v. Handle Co.,* 188 N. C., 222.

The defendant, on its motions to nonsuit, stated in its brief: "Unless the evidence establishes beyond a reasonable doubt that the defendant had formed a purpose to monopolize the coal business in Winston-Salem and 'willfully' undertook to 'injure' its competitors, the verdict is without support in law and fact, and, therefore, must be set aside." We cannot so hold. We think there was sufficient evidence to be submitted to the jury that defendant came within the above clear statement of the controversy.

It goes without saying that reducing the price of coal to the consumer below what the defendant paid for same, with the other evidence above set forth, is sufficient evidence to be submitted to the jury that defendant formed a purpose to monopolize, and willfully undertook to injure its competitors. In fact, the sales for November and December, 1935, doubled its sales for the same months of the previous year. The defendant's president himself said: "In the spirit of fairness, I will have to admit that might possibly have the effect of reducing the number of coal dealers."

The court below charged the jury: "The defendant is indicted for violating certain sections of chapter 53 of the Public Laws of 1913, and the amendments thereto. The two sections involved are as follows: It prohibits the defendant from doing the following things: 'To willfully destroy or injure, or undertake to destroy or injure, the business of any opponent or business rival in the State of North Carolina with the purpose or intention of attempting to fix the price of anything of value when the competition is removed.' The State in that count in the bill charges this defendant with attempting to injure the business of opponents by reducing the price of coal and then raising the price after the competition has been destroyed. The statute says 'with the purpose or intention of attempting to fix the price of anything of value when the competition is removed.' That is one charge." Then the other section is set forth, but is not necessary to be considered, as the judgment will be sustained if correct on the above section.

The court then set forth the entire evidence in detail: "The State contends from this testimony you should be satisfied beyond a reasonable doubt that the defendant lowered his prices and that in doing so its purpose was to get rid of its competitors, and after putting its prices down and getting rid of them, it was its purpose or intention to increase the prices. . . . Now, gentlemen, a person may sell his coal for whatever he wants to unless he does it for the purpose prohibited by this statute. There are no two merchants in the town, probably, who sell two articles at the same price. A merchant may sell his merchandise for ten, twenty-five, fifty, or a hundred per cent profit. He may sell it for less than it costs. There is no law against that. (He does violate the law if he sells under this section, if he lowers the price of the product sold for the purpose of injuring or destroying his competitors, and after his competitors had been gotten out of the way, then he raises his price so that he sells his coal at a higher price to the detriment of the public. That would be a violation of the law.)" To the above portion of the charge in parentheses, defendant excepts and assigns error. Taking the charge as a whole, it clearly defines the offense. In fact, the language of the act is so simple that "He that runs may read" (Cowper).

If defendant desired the court to charge more in detail, or on a subordinate feature, it should have requested the court to do so under proper prayer for instructions. It is almost too well settled in this jurisdiction to cite authorities. *S. v. Johnson,* 193 N. C., 701 (703). The exception and assignment of error cannot be sustained.

The court below charged the jury: "The defendant contends he has not violated the law in any respect; that he lowered his prices because he felt that method of doing business would be more profitable than the one he was doing; that in lowering the prices he sold more than twice the amount of coal during a given period, and that he received a small profit per ton, but by the quantity sold, in the aggregate, he made more money during that period of time, and that he had no intention or no purpose of putting other coal dealers out of business, and, in raising the price, the defendant contends, gentlemen, there is no evidence offered or before you to warrant you in finding he is guilty of violating this section; that there is no evidence whatsoever, the defendant contends, that he has gotten rid of his competitors and no evidence he will ever get rid of them; that there is no evidence that he will raise the price of coal, and the defendant contends you should not be satisfied beyond a reasonable doubt from all this evidence that is the intention of the defendant, that he intends, as the statute says, to willfully destroy and injure his competitors. (Willfully means the doing of a thing without justification or excuse, the wrongful doing of an act without justification or excuse. That is what 'willful' is.)" To the portion of the above charge in parentheses, the defendant excepts and assigns error. This cannot be sustained. One of the ingredients of the crime is that it must be willful.

The defendant says that is an incorrect definition of "willful" as used in criminal statutes. He also says that the court should have defined to the jury the meaning of "justification" in the law of monopolies. Decisions upon the definition of "willful" in criminal statutes show the correctness of the charge of the court below. *S. v. Whitener,* 93 N. C., 590; *S. v. Taylor,* 175 N. C., 833; *S. v. Cook,* 207 N. C., 261; *Surety Co. v. Sullivan,* 7 Fed. (2d), 605.

In the *Cook case, supra,* the Court cites and adopts as the correct definition of "willful" when it appears in a criminal statute that definition which appears in the *Whitener case, supra.* The Court says that "willful" means the doing of something "intentionally, without just cause or legal excuse." The Court seemed to assume that such a definition was substantially the same as that given by *Justice Ashe* in the *Whitener case, supra:* "The word 'willful,' used in a statute creating a criminal offense, means something more than the intention to do a thing. It implies the doing the act purposely and deliberately, indicating a purpose to do it, without authority—careless, whether he has the right or

not—in violation of law, and it is this which makes the criminal intent, without which one cannot be brought within the meaning of a criminal statute."

*Circuit Judge Hand,* in the *Sullivan case, supra,* goes so far as to say: "The word 'willful,' even in a criminal statute, means no more than that the person charged with the duty knows what he is doing. It does not mean that, in addition, he must suppose that he is breaking the law."

The jury could not have been misled by the failure of the judge to explain the meaning of "justification" in the law of monopolies, since obviously it could only mean in the instant case that the defendant would be "justified" if he lowered his prices only to foster his own trade, and not to injure his competitors nor to monopolize the business. Hence, in effect, the court did define "justification" when it charged the jury it could not convict, unless it found defendant intended to injure his rivals and then fix prices after competition was removed. If the defendant wanted a fuller explanation, he should have requested it. *S. v. Ammons,* 204 N. C., 753; *S. v. Gore,* 207 N. C., 618; *S. v. Hendricks,* 207 N. C., 873.

The court did not impinge on C. S., 564, but in a clear and logical way it set forth the facts and gave the contentions fairly on both sides, and charged the law applicable to the facts. "Beyond a reasonable doubt" was charged and clearly defined.

"The defendant, gentlemen, is presumed to be innocent of the offense with which it is charged until evidence is offered that satisfies you beyond a reasonable doubt of its guilt. Being satisfied beyond a reasonable doubt does not mean beyond all doubt, imaginary doubt, captious doubt, or possible doubt, but it means a fair doubt, based upon reason and common sense, and growing out of the testimony in the case. It is such a doubt as leaves your mind, after you carefully consider all of the testimony, in such a condition that you cannot say you have an abiding conviction to a moral certainty in the guilt of the defendant. The defendant is charged here with a criminal offense. The law presumes it is innocent of the offense until the State has offered evidence or until evidence is offered in the trial of the case that satisfies you beyond a reasonable doubt of the defendant's guilt. The State contends from the evidence offered in this case you should be satisfied that the defendant is guilty as charged in those counts in the bill of indictment. The defendant contends that you should not."

The defendant denied the material allegations of the State and its evidence was to the effect that what it did was a legitimate business venture and in good faith. F. W. Beazley, president of the defendant company, testified: "I had no intention of injuring our business com-

petitors in Winston-Salem by lowering the prices of coal. Our intention was just the opposite. We felt that lowering the prices and reducing the margin of profit would cause an increase in the sales of coal and put us in a position where we could continue to sell at a lower margin of profit. We certainly had no intention of raising the prices of coal."

The evidence, on every aspect of the contentions, *pro* and *con,* was submitted to the jury. They were the triers of the facts and adopted the State's version and rendered a verdict that defendant, beyond a reasonable doubt, was guilty. In the record is a pathetic appeal to the president of this gigantic corporation, with 50 large branches in 7 states: "I also told him they depended on nothing but a living out of the coal business and it just meant meat and bread to them, and if he couldn't think of the human side and adjust things so that we might operate and make a living," and the answer was, "What he wanted was tonnage, and that was what he was going to get, and there were too many coal dealers in Winston-Salem, anyhow." It is the same old story. There came to Him a man with a withered hand on the Sabbath day to be healed, "And they asked Him, saying, Is it lawful to heal on the Sabbath day? that they might accuse Him. And He said unto them, What man shall there be among you, that shall have one sheep and if it fall into a pit on the Sabbath day, will he not lay hold on it, and lift it out? How much then is a man better than a sheep?" Is a man better than tonnage? The jury, on the charge in the indictment and evidence, found the defendant guilty. There being no error in law, we cannot disturb the verdict and judgment.

On the entire record, we see no prejudicial or reversible error. On a trial free from error the defendant has been convicted for violating the law of this State. We find

No error.

STACY, C. J., dissents.