STATE v. AZOR BROWN.

(Filed 7 November, 1940.)

**1. Criminal Law § 52b—**

Upon motion to nonsuit, all the evidence upon the whole record tending to sustain conviction is to be considered in the light most favorable to the State, and it is entitled to every reasonable intendment thereon and every reasonable inference therefrom, and only the evidence favorable to the State will be considered. C. S., 4643.

**2. Criminal Law § 52a—**

The competency, admissibility, and sufficiency of evidence is for the court; its weight, effect and credibility is for the jury.

**3. Homicide § 25—Evidence held sufficient for jury on question of defendant's guilt of murder in the first degree.**

Defendant admitted he shot his wife, but testified that the shooting took place in a scuffle and was accidental. Defendant's employer, as a witness for defendant, testified that defendant told him he had seen his wife in bed with another man, that he went to the plant where he was employed as a night watchman, stayed there all night, and then went back to the house where his wife was, got into an argument with her and intentionally killed her. The State's evidence tended to show that defendant procured the pistol from his employer's plant, that the shots fired caused death, and that defendant stated to officers that he intentionally killed his wife because "she did not treat me right." *Held:* The evidence is plenary to be submitted to the jury as to murder in the first degree.

**4. Homicide § 27a—**

In this prosecution for homicide, the charge of the court in defining the degrees of homicide, and premeditation and deliberation, and in charging the law as to voluntary drunkenness, and in applying the law to the facts adduced by the evidence, *is held* complete and accurate and without prejudicial error.

**5. Homicide § 4c—**

The mental processes of premeditation and deliberation do not require any fixed length of time, it being sufficient if these mental processes occur prior to the killing, and the killing be executed in accordance with a previously formed, fixed intent to kill.

**6. Criminal Law §§ 59, 81a—**

A motion to set aside a verdict as being contrary to the weight of the evidence is addressed to the discretion of the trial court and its decision thereon is not reviewable.

**7. Criminal Law § 56—**

A motion in arrest of judgment is properly denied in the absence of a vital defect appearing upon the face of the record.

**8. Criminal Law § 53b—**

An inadvertence of the court in stating defendant's testimony was called to the court's attention, and the court thereupon stated that it

might be in error in regard thereto and that the jury should rely upon its recollection of the evidence upon the point. *Held:* The inadvertence was sufficiently corrected in the absence of a request by the defendant that the court review the evidence on that particular aspect.

**9. Criminal Law § 78b—**

Ordinarily, only exceptive assignments of error will be considered on appeal, but where defendant has been convicted of a capital felony the Supreme Court will nevertheless review defendant's contentions as to error in the trial and will review the record for error appearing upon its face.

APPEAL by defendant from *Phillips, J.,* and a jury, at July Term, 1940, of CATAWBA. No error.

The bill of indictment is as follows: "The jurors, for the State, upon their oath present, that Azor Brown, late of the County of Catawba, on the 26th day of May, in the year of our Lord one thousand nine hundred and forty, with force and arms, at and in the County aforesaid, unlawfully, willfully, and feloniously with premeditation and deliberation, and of his malice aforethought, did kill and murder one Bertha Brown, a human being, against the form of the Statute in such case made and provided and against the peace and dignity of the State. L. S. Spurling, Solicitor."

The defendant pleaded "Not guilty." The jury returned a verdict of guilty of the crime of murder in the first degree as charged in the bill of indictment. The court below pronounced judgment, in part, as follows: "Shall cause the body of the said Azor Brown to be placed in the gas chamber in the said State's Prison, and shall then and there cause the said Azor Brown to inhale and consume a sufficient quantity of lethal gas, or other gases provided for the purpose of execution in the State's Prison until he, the said Azor Brown shall be dead—and to you, the said Azor Brown, the Court prays that God may have mercy on your soul."

*Facts:* Witnesses for the State: Dr. H. E. Barnes testified, in part: "I examined Bertha Brown, wife of the prisoner at the bar, on the day it is alleged she was killed, on the 26th day of May of this year. She was on the floor in the room of the house where she is alleged to have been killed. She was lying on the floor on her left side. The examination revealed that she had a hole through the right thumb with powder burns; another one in the left cheek with powder burns, that went backward and upward in the skull; and a third one on the right of the neck just above the collar bone with powder burns, and ranged downward and out just under the shoulder blade. I found three different bullet wounds in the body. She was dead when I got there. I do have an opinion satisfactory to myself as to what caused her death, either one of the bullets through her chest or her cheek could have caused the death."

STATE *v.* BROWN.

Beulah Brown: "I married Azor Brown's brother. . . . He (defendant) came in the back door. He said: 'Bertha, I want to speak to you about a minute.' . . . Yes he left his wife at my home when he went away that time, she did not go with him. He said, 'Bertha, I want to speak to you a minute,' and they went in the same room they went in the first time, and was laughing and talking and stayed in there a while—about a half hour—I heard a gun shoot and I was in the back room, and I ran in there and before I could get in there he had done shot three times; he shot about three times, he shot three times before I got in there and she was . . . I heard one shot and then two more. Yes, he was in the room where she was when I went in, he was standing there rubbing her leg. I said, 'What in the world have you done, you killed Sis,' and I backed out of the room and called Mr. Lentz. Azor ain't opened his mouth yet, he did not answer me, he went back out the back door. I can't say whether he had anything in his hand or not, I didn't look. It was getting along about ten or eleven o'clock when he shot her. From the time he left my house when they put the dog in the car until he came back was about something like thirty minutes. . . . (Cross-examination) The doctor came to see about Bertha. I don't know whether Azor was drunk or not, I wasn't close enough to him to tell. I don't think Bertha was drunk, I don't know whether she was drinking or not. I don't know what they done in that bedroom, but whatever they done, it was done quietly, there was no disturbance in that room."

Chief E. W. Lentz testified, in part: "I looked in the room where she was lying on the floor and saw that she was dead, blood was over the floor and I went out looking for Azor. I went out on the outside and I came back and as I came back he stepped out of the other room and went to the front door and Sheriff Barrs and Mr. Shuford met him there, and he had this gun on him, buckled around him; it is a forty-five caliber, and I opened it, it had three empty shells in the gun. When I went up to Azor I said, 'What in the world is wrong, was this an accident or did you do it on purpose?' He said, 'It wasn't no accident, I shot her myself.' He was drinking—drinking pretty heavy and I put him in the car. . . . He told me later why he shot her. I talked to him after he went to the jail. I could not get him up for several hours to talk, and he said that she had been spending the nights down there with Ernest Hewitt and that he was tired of it and was fussing with him that morning about it, and he went up to Mr. Cox' where he night-watched and got the gun and shot her. He said he called the taxi at John Brown's and went back up to Cox', a little over two miles, and came back. Said the pistol belonged to the Cox Manufacturing Company. He said he went up there for the pistol and came back. The

14—218

pistol had just been fired and there were three empty shells in the pistol. The woman was dead. (Cross-examination) I found Azor soon after I arrived at the house, I had not been there but three to five minutes before I found him. Yes, at that time he was pretty drunk, pretty full. He was still drunk that afternoon. Yes he said it was not an accident, he said 'I shot her.' "

T. W. Shuford: "I met this boy Azor Brown coming through the hall and he walked up to Sheriff Barrs and started out to the car and I noticed this gun hanging on his side and I took the gun off him and gave it to the Chief, and we took him and put him in the car and Chief said, 'Was this an accident?' and he said, 'It was not no accident,' and Chief went back in the house and Officer Barrs and myself sat in the car and asked Azor 'How come you to shoot that woman?' and he says, 'She did not treat me right, if I had it to do over I would do it again.' (Cross-examination) He did not tell me how the shooting took place other than what I have told. At the time I put Azor in the car he was drunk, in fact he was very drunk."

Defendant testified, in part: "I went up the hill and Sis was on the front porch by herself looking out at the street, and I called 'Sis, come here,' and she came to me and I said, 'Well, we got to walk home, I spent all my money riding around in the taxi.' She laughed and said, 'I got some money,' and I said, 'How about another drink if you got some money,' and she said 'Oh.' She went out the door and I went in the room and lay on the bed. She was gone three or four minutes, and she came back with a half pint of whiskey and we sat down and drunk the whiskey. I don't know where it come from, and we drunk the whiskey all but about that much (measured off about an inch of his finger in the opinion of the reporter). She said, 'I can't drink no more' and I said, 'I can't either,' and I said, 'Let's go home before we fall down.' The gun was in the holster, and I got the gun from between the mattress and laid the gun on the bed while I fastened the holster on me around my waist. I reached for the gun and she said, 'Let me carry the gun,' and I said, 'No, I ain't going to let you carry nothing.' She said, 'You don't carry nothing,' and I said, 'You ain't woman enough.' She grabbed hold of the gun and I said, 'Turn the gun aloose,' and she said, 'No, I am going to show you that I am woman enough to take it.' It fired and fired again, and she snatched the gun again, and she fell in my arms, and she held the gun, and she went down on her knee, and I laid her down on my knee, and I called her and I said, 'Sis,' and she said, 'I am shot.' . . . I put the gun in my pocket and went out the back door and came around to the front door. . . . They put me in the car and carried me to jail, and as for Mr. Lentz asking me about the shooting and me telling him I meant to do it, I don't remember

telling him that, but I am not disputing his word. . . . No, sir, I did not have any intention of shooting my wife. I had not had any thought in my mind that I would kill my wife that day. I am telling you the truth. I carried that pistol on my rounds as night watchman sometimes every hour. I would take a nap and when I would wake up and make my rounds I carried the gun with me, carried it in the holster when I was making my rounds. The gun belongs to Mr. Cox. . . . No, sir. I did not shoot her at all and she did not shoot herself. We were scuffling over it. No, sir, I didn't pull back three different times and fired. *We were scuffling, and my hand might have been on the trigger, it would have to been, but I did not know it was on the hammer each time before it fired.*" He denied what the officers said he told them about the shooting. "No sir, I did not go back to get the pistol. Yes I know Ernest. We were good friends, we never had any trouble over my wife and him. She told me it was his liquor. . . . Yes sir, I tell this jury that the pistol actually went off three different times and accidentally shot her and all the shots hit her, none struck me."

William Cox, a witness for defendant, testified that defendant worked for him about 12 to 15 years, that his reputation was good. On cross-examination he said: "Yes, I permitted him to carry a pistol there at night, he just had it there on the job. I permitted him to keep this pistol there with the understanding that he was never to take it off the place. . . . About eleven o'clock I went to the plant Sunday morning and while I was in the plant I heard a car drive up, and I looked out and saw a Yellow Taxi out there, and I did a little something and went out to the front and started to go home and Brown came out of the basement and got in the car. . . . I saw him Sunday night in the jail, and I asked him how it happened and he told me how it happened. He said he came down there Saturday evening and fooled around there until about dark, I believe he said, and got a taxi and tried to get his wife to come back with him, and she would not come, and he said, 'I got in the taxi and went to the top of the hill to make her think I had gone to the plant, and *I circled around back and saw her in bed with this man Hewitt,*' and then he said '*I came up to the plant and stayed up there all night and went back down there Sunday morning about eight o'clock and we got in an argument and I killed her and I meant to kill her.*' Now whether he knew what he was talking about I don't know, but I don't think he was so drunk that he did not know what he was saying. I think he was sober enough that he knew what he was saying when he talked to me and Chief Lentz there. He said he came up and got the gun on Sunday morning. He did not say anything about taking the gun with him and hiding it in the bed. He told me he came up and got the gun and came back and shot his wife. The

gun was kept in the room in the basement at the plant, that is the room I saw him coming out of when he did not speak. The same evening he told me that he went up there and got the gun that morning."

The defendant made several contentions and appealed to the Supreme Court. These and other necessary facts will be set forth in the opinion.

*Attorney-General McMullan and Assistant Attorneys-General Bruton and Patton for the State.*

*G. A. Warlick, Jr., for defendant.*

CLARKSON, J. .The defendant's case on appeal is defective in several respects in not complying with the Rules of Practice in the Supreme Court, secs. 19 (3), 21, 27½, 28—192 N. C., 837. This being a criminal case with penalty of death, we will consider defendant's contentions.

At the close of the State's evidence and at the close of all the evidence, N. C. Code of 1939 (Michie), sec. 4643, the defendant made a motion in the court below for judgment of nonsuit. The motions were denied and in this we can see no error.

We repeat again, the well settled law in this jurisdiction: In *S. v. Lawrence,* 196 N. C., 562 (564), it is written: "On motion to dismiss or judgment of nonsuit, the evidence is to be taken in the light most favorable to the State, and it is entitled to the benefit of every reasonable intendment upon the evidence and every reasonable inference to be drawn therefrom. 'An exception to a motion to dismiss in a criminal action taken after the close of the State's evidence, and renewed by defendant after the introduction of his own evidence does not confine the appeal to the State's evidence alone, and a conviction will be sustained under the second exception if there is any evidence on the whole record of the defendant's guilt.' *S. v. Earp, ante,* at p. 166. See *S. v. Carlson,* 171 N. C., 818; *S. v. Sigmon,* 190 N. C., 684. The evidence favorable to the State is considered—defendant's evidence is discarded. *S. v. Utley,* 126 N. C., 997. The competency, admissibility and sufficiency of evidence is for the court to determine; the weight, effect and credibility is for the jury. *S. v. Utley, supra; S. v. Blackwelder,* 182 N. C., 899." *S. v. Coal Co.,* 210 N. C., 742 (746).

Defendant admitted that he shot his wife, Bertha Brown, three times, either of which wounds could produce death. He claimed on the trial, when a witness, that the shooting took place in a scuffle with his wife and he had no intention of shooting her. On cross-examination, he stated, "We were scuffling, and my hand might have been on the trigger, it would have to have been, but I did not know it was on the hammer each time before it fired." He told Chief Lentz, "It wasn't no accident, I shot her myself." He told Shuford (who asked him), "How come you

to shoot that woman?" "She did not treat me right, if I had to do it over I would do it again." William Cox, his employer, testified that defendant told him, "I circled around back and saw her in bed with this man Hewitt," and then he said, "I came up to the plant and stayed up there all night and went back down there Sunday morning about eight o'clock and we got in the argument and I killed her and I meant to kill her." The evidence is plenary to be submitted to the jury as to murder in the first degree.

The court below, on this aspect, under the allegations in the bill of indictment, charged: "There are three degrees of unlawful homicide: Murder in the first degree, murder in the second degree, and manslaughter. Murder in the first degree is the unlawful killing of a human being with malice and with premeditation and deliberation. Premeditation means thought beforehand, for some length of time, however short. Deliberation means that the act is done in a cool state of the blood, it does not mean brooding over it or reflecting upon it for a week, or a day, or an hour, or any other appreciable length of time, but it means an intention to kill executed by the defendant in a cool state of the blood, in furtherance of a fixed design to gratify a feeling of revenge, or to accomplish some unlawful purpose, and not under the influence or a violent passion suddenly aroused by some lawful or just cause, or legal provocation. When we say a killing must be accompanied by premeditation and deliberation it is meant there must be a fixed purpose to kill which preceded the act of killing for some length of time, however short, although the manner and length of time in which the purpose is formed is not very material. If the purpose to kill was formed simultaneously with the killing, then there is no premeditation and deliberation and the homicide would not be murder in the first degree." *S. v. Burney,* 215 N. C., 598 (614).

In *S. v. Steele,* 190 N. C., 506 (511-12), *Varser, J.,* for the Court, said: "The requirement, in first degree murder, in order to constitute 'deliberation and premeditation' does not require any fixed time beforehand. These mental processes must be prior to the killing, not simultaneous, 'but a moment of thought may be sufficient to form a fixed design to kill,'" citing authorities. *S. v. Hammonds,* 216 N. C., 67 (75); *S. v. Hudson, ante,* 219 (232-3).

The court below charged accurately the law of murder in the second degree, manslaughter and the phase of not guilty as to accidental killing; defined reasonable doubt and placed the burden of proof on the State in regard to first degree murder; charged the law of voluntary drunkenness. The charge covered every aspect of the law applicable to the facts. It was complete and accurate and gave the contentions fairly and impartially for both sides.

The defendant contends that the court below should have set aside the verdict as being contrary to the weight of the evidence. This court has consistently held that this is a discretionary matter and not reviewable on appeal. *S. v. Caper,* 215 N. C., 670 (671), and cases cited.

The court below, in the exercise of its discretion, denied the defendant's motion to set aside the verdict and its decision on this matter is final.

The defendant made a motion in arrest of judgment. The defendant makes only a formal motion and does not undertake in the record to specify on what particular alleged defect his motion is based. A motion in arrest of judgment must be based on some matter which appears, or for the omission of some matter which ought to appear, on the face of the record. *S. v. McKnight,* 196 N. C., 259 (260), and cases cited.

There is no defect appearing on the face of the record such as would entitle the defendant to have the judgment arrested and his motion was, therefore, properly denied. *S. v. Linney,* 212 N. C., 739 (741), and cases cited.

The inadvertence of the court below in quoting the evidence was called to the attention of the court by defendant and we think was sufficiently corrected.

The court charged the jury: "Gentlemen of the jury, the court may be in error as to that; you will remember the evidence as to that, you will not take the court's recollection. Counsel may be correct in that, the court is not certain as to that, but you will rely upon your recollection as to what the evidence was as to that." If defendant wanted exactly what was said, he could have requested the court to review the evidence on that aspect. If error, it was harmless and not prejudicial.

We have considered the exceptions, although not in compliance with the Rules of this Court. There is no exception or assignment of error to the charge or the evidence.

The whole matter of appeals to this Court, as a guide to the legal profession, is set forth in *Rawls v. Lupton,* 193 N. C., 428. This case has been repeatedly approved. In *S. v. Parnell,* 214 N. C., 467 (468), we find: "Five assignments of error, all directed to the charge, are attached to the 'case on appeal'—considering it now as 'deemed approved' —but these assignments are based on no exceptions. *Rawls v. Lupton,* 193 N. C., 428, 137 S. E., 175. Only exceptive assignments of error are availing on appeal. *In re Beard,* 202 N. C., 661, 163 S. E., 748; *S. v. Freeze,* 170 N. C., 710, 86 S. E., 1000."

In the case of *S. v. Bittings,* 206 N. C., 798 (800), is the following: "If this were not a capital case it would be necessary to affirm the judgment on motion of the Attorney-General for failure properly to present exceptive assignments of error. *S. v. Freeze,* 170 N. C., 710, 86 S. E.,

1000; *S. v. Kelly, ante,* 660. . . . No exceptions were taken to the admission or exclusion of evidence and none properly to the charge. There was a formal motion to set aside the verdict and one in arrest of judgment, to which exceptions were entered, but otherwise the assignments of error are without exceptions to support them."

In this case there are only four formal exceptions contained in the record and no assignments of error. We have examined the record carefully. We think the case was tried in accordance with the law in this jurisdiction. The charge was able and covered every aspect of law applicable to the facts.

On the whole record we can find no prejudicial error.

No error.