The defendant, Dave Burney, was indicted for the murder of Mordie Kinsey on 25 August, 1938, and entered a plea of "not guilty." The jury rendered verdict, "That the defendant is guilty of murder in the first degree." The court below rendered judgment on the verdict, "Shall cause the said prisoner, Dave Burney, to inhale a sufficient quantity of lethal gas to cause the death of the said prisoner."
The evidence was to the effect that Dave Burney was a tenant on the farm of Clifford Harris in Jones County. The defendant had in his home his wife and the deceased Mordie Kinsey, her daughter, Orphie Kinsey, Lula May Hall, Cricket Hobbs, and including grown persons and children about twenty in all. It was in evidence that there was bad feeling between defendant and Clyde Morgan, on account of Morgan's attention to Lula May Hall and Orphie Kinsey, daughter of Mordie Kinsey, all of whom were living with and working for defendant. It was in evidence that on the day of the killing, 25 August, 1938, on his way from Kinston in the evening, the defendant had purchased some shells with No. 4 shot for a gun which he owned. On reaching home he had Clyde Morgan take the gun down to the tobacco barn on the place, some quarter of a mile away. Later, about 8:00 or 8:30 o'clock the same night, he had Orphie Kinsey and her mother to go to the barn. There he had a fight with Orphie and tore some of her clothes off and she fled. He later shot her mother, Mordie Kinsey, near the house.
The following witnesses for the State testified, in part:
George A. Moore: "And we sat on the porch and we heard some things, and we said. Soon after he came back from the tobacco barns he (defendant) and whoever was with him went on down to his home again, and I heard him cursing, and he said to someone, "G — damn *Page 601 
you. You know all about it. I am going to kill you, G — damn you." Well, in just a short while, I don't know how long, I wouldn't like to say, but it was just two or three minutes, it seemed to me (in fact, it didn't seem to be over a minute) I heard a gun fire. Up until that time I heard Dave cursing right loudly, but immediately after the gun fired everything was quiet down there. I heard nothing more for several minutes. And then I heard a beating noise, in two or three minutes, I guess it was, from the time I heard the gun fire, it might have been five minutes."
Orphie Kinsey: "I am 21 years old and live with Uncle Dave Burney; my mother lived there also. I was eight years old when we moved there, was living there at the same time with my mother and his niece and three of we girls. One of them was his niece's girls, and two of them were mother's girls. To tell the truth about it, I really don't know whether mother had any children by him while she was staying there, and she and he didn't sleep together. Yes, he had intercourse with me one time. . . . That night he came back from Kinston, and he told me and her (meaning her mother) to come, that he wanted to talk with us some, and me and her started with him. He didn't say where. He had come from Kinston at 7:00 o'clock Thursday night, and we started with him at the house, and he got half way from the house to the tobacco barn, and he said, `Orphie, you and your mother are sons of bitches, aren't you?' and I said, `No, we ain't,' and he said, `You is,' and she turned around then and started back to the house or went back to the house. I don't know what she went back for, and I went on with him, and we got to the tobacco barn door, and me and him started in to wrestling, and he throwed me down and beat me in the face. He beat me with his fist, and then I got loose from him and he tore my clothes. . . . I run from there to the corn field but he didn't run after me. . . . She (a neighbor) told me to go to Uncle Frank Greene's, so I went there. I reckon that was a mile and a half from where we lived. . . . Since I talked to you yesterday, Dave Burney has seen me. He saw me today, right here and talked to me, but he didn't say anything, only asked me how the children were getting along and where I was living and everything. He was with the sheriff and told me to come on around to the jail. Q. And that's the reason you are testifying like that? Ans.: No, sir, he didn't ask me anything about this. He just asked me how I was getting along and how were the children. (First objection.) (Defendant objects to the question and answer; overruled, defendant excepted.) Q. Who else was there? Ans.: Cricket Hobbs. Q. Cricket is another one of his women living there? (Second objection.) (Defendant objects; overruled, defendant excepted.) Ans.: She is a girl that lives there. He raised her and she *Page 602 
stays there. I have a baby six years old, both of them was born while I was living with Dave. Yes, I talked to Dave's lawyer this morning. I didn't tell you that, because you didn't ask me if I had talked to him. I have been living there with Dave Burney since I was eight years old, and he took care of me and treated me like he would his daughter. On the week-end before the shooting I went off and stayed, and mother didn't know where I was and I reckon that was what he was mad with me about. . . . I said I spent one night away from home. I left that way because Dave told me to go up there and stay with Lillie Foy the third Sunday before that Thursday, and when I went back home he was not there, and when he came he had a little stick in his hand, and he hit me with the stick and I ran, and he got his gun and pointed out the window. I was outside, and I got away and left that time, and that was the cause of my leaving. I had been back there before this night on which my mother was killed. I came back on Monday about 4:00 o'clock, I reckon, before she was shot on Thursday."
C. F. Brooks: "I live close by Dave Burney. I live on the same farm. I heard cursing. He was doing the cursing. He was cursing the woman, told her she had told a damn lie. That woman that he shot. And he said, `I am going to kill you.' And about that time the gun fired, I heard some fussing down there. Something like three-quarters of an hour. Dave Burney was doing the cursing then. He was cursing Orphie. I can't tell you what he was saying down there. He was using vulgar language. I did not go there that night. I went the next morning. I found the dress lying in the tobacco barn torn, and saw a dress with some blood on it. . . . Practically a whole dress. Torn practically all to pieces and there was buttons lying around all about all on the path. And I picked them up and gave them to the sheriff. Two pieces of underwear. . . . I heard some cursing; it was at Dave's house or right around his house, about the porch, somewhere. He was cursing people, saying that he was going to kill people about there, and that there were two or three more he was going to get, and then he was going to die and be satisfied and go to hell."
J. P. Taylor: "I saw the shot that came out of this woman's body; they were No. 4's. I got some of the wadding, but I didn't get the shot. That was taken from the wound in the hospital on Friday. I saw the leg that was all swollen up. It was mangled and there was a hole about an inch and a half in diameter. The leg was almost cut in two."
Leo Kinsey: "I was not there when mamma was shot. He said, `Mordie, you are nearly dead, and G — damn you, I am going to finally kill you.' He was talking to mamma then. At that time I was in the kitchen. He hit my mamma with a stool chair and a rocking chair. *Page 603 
That was after he shot her . . . . The door in the room where I was in was shut, and in the middle room the door was open. The door that I set out through was open. Nobody told me to come here and tell anything. I seed what I told, and I am positive about it. (Court) How long have you lived with Dave Burney? Ans.: I don't know. (Court) That was your mamma who was killed? Ans.: Yes. (Court) Do you know who your father is? Ans.: No." (Exception.)
Dr. R. G. Tyndall: "I am a practicing physician and surgeon in Kinston. I remember when this woman, Mordie Kinsey, was carried to the hospital. I don't know the date, but I remember very well the case. Sometime in August. . . . Her right leg from her knee to her shoe-top on the back, from the calf of her leg, it was all torn wide open, and I judge it was about three-quarters — were peppered from her knee to her ankle with about fifteen or twenty on the other leg at about the same level. They had the leg all wrapped up in her clothing and it was, of course, all saturated with blood. After the nurse helped me to clean out the wound and pull out the gun wadding I gave her some stimulant for her heart hoping that we could do something else about it. Next day we gave her some blood, and her leg from the knee down became cold from lack of circulation. And Dr. Parrot and I consulted, and we decided the leg would have to come off, but not in that condition. And we were hoping for some improvement in her condition, but she gradually got worse until she died. I can't say for certain, but it was three or four days before she died. I have an opinion satisfactory to myself as to the cause of her death. It was shock and hemorrhage from the wound in her leg. She is dead."
Sheriff J. W. Creagh: "This matter was brought to my attention on Friday, the 26th of August. The day after the shooting. I went to Dave Burney's house to make some inquiries, and arrested him and brought him to jail, and then went back up there and found that the woman was in Kinston in the hospital. I then went to Kinston and attempted to question her. Dave Burney made a statement to me, and he made that statement freely and voluntarily without any reward or hope of reward or any threats. . . . That was in my car and Dave was under arrest, and we were on the way to jail. I warned him of his constitutional rights and told him that anything he said would be used against him, and I told him that again in jail. (Court) You have said you did not hold out any reward or hope of reward, or make any threats? No, sir. Dave stated that he had shot this woman, but that his intentions were to shoot Orphie Kinsey. . . . I asked Mordie Kinsey if she knew her condition and she said she knew it, and expected to die. Her statement was that she knew she might die any minute and wanted to tell the truth before she died. She stated that Dave *Page 604 
Burney, when he came from Kinston, called her and her daughter from the house and told them to go with him, and that they went down the road towards the tobacco barn and that after they had gotten part of the way to the tobacco barn that Dave and her daughter started fighting and that she went back to the house. She said a few minutes later that she saw Dave coming back to the house and that she went out into the lot. She stated that Dave came out to the lot, to the barn with a gun and that she saw him. The statement that she made me was that she sort of stooped, squatted, and that he shot her. She stated that he then came out to the lot and dragged her back to the house and made the statement, `G — damn you, I haven't killed you, but I will.' And struck her several times with a chair. She said then she was put on a quilt on the floor, and one of those women was told to watch her, Fannie, she called her. And then she said, Dave left the house, and she stayed there until the next day about noon, when Mr. Harris came and brought her to the hospital. She said that she was not put on a bed; that she was put on the floor on a quilt. She said that nothing was done for her from that time until next day at twelve o'clock. She said he struck her with the chair on the head. She said that he cursed both of them and that he and her daughter started fighting and she went back. The lot is right at the house, Dave Burney's house. I should say ten or fifteen steps from the house. The tobacco barn is between a quarter and a half mile from the house . . . . She did not say Dave carried her in the house; she said he dragged her in the house, a distance I would say of about twenty or twenty-five yards. Her statement regarding when they first went out, she and her daughter together, was that he cursed both of them, but he did not make any threats. (Court) Sheriff, do you recall whether she stated he had a gun when he requested her and her daughter to go with him in the direction of the tobacco barn? Ans.: He did not; she said he didn't. That tobacco barn that they were proceeding in the direction of was the same one referred to, or described by the witness, Clyde Morgan." J. P. Taylor corroborated the testimony of the sheriff.
The following witnesses for defendant testified, in part:
Clifford Harris: "I own the farm on which Dave Burney lives. . . . I saw Dave Burney on about August 25th. I saw him at the farm and he went to Kinston with me that day, that afternoon. I saw him the next day, at my home and in Kinston. He told me he had shot Mordie. He asked me to go with him to his home. He told me he wanted me to go down there to see her. I asked if she was shot badly, and he said he didn't think so, that she was shot in the legs. And he told me to go to see her and if we had to take her to the hospital that he wanted me to help to get her there. I went. He didn't go with me *Page 605 
in my car. As soon as I could get ready to go I went and he came back right behind me. Some colored woman brought him out in an automobile, and he got there in a few minutes after I got there. I saw the women. She was suffering pretty badly. She was shot in the legs, both legs; the right leg was shot worse and I told him to get her to the hospital as quickly as possible. He carried her to the hospital. He went part of the way with his colored woman, and I was behind him. I was going to make arrangements at the hospital so that they would take her in. That was about noon, I will say, and he had been to Kinston and back. He doesn't have a car of his own. He has no means of transportation. I made arrangements at the hospital for him. He didn't have any money. I saw Mordie at the hospital. The doctor asked her who shot her and she said, `Dave,' and he said, `How come him to shoot you?' And she said, `Accidentally.' And he said, `Well, how come him to shoot you?' And she said he was shooting at somebody else. And the doctor asked her who was he shooting at, and she said, `I don't know.' And then Dave told the doctor that he was shooting at her daughter. Dave was in the hospital when she said what she did to me, or rather, she wasn't telling me, she was telling the doctor. That was on Friday, immediately after we got her in the hospital, about one o'clock. (Cross-examination): Q. How many women did he have there? Ans.: Why, there was, let's see, about five, I think, grown women. Q. And all of them have children, haven't they? Ans.: I think so. Q. There are about twenty-odd children around there, are there not? Ans.: Something like that. Q. And they are his, aren't they? Ans.: I don't know, sir. Q. And some of them are kin to him? Ans.: Some of the people staying there are kin to him." (Defendant objects as this is not relevant.) (Court) "I am assuming that he is offering it on the question of motive. If that is not it, I will exclude it. On what theory is that testimony offered, Mr. Solicitor? (Solicitor): On the theory that he was planning to get rid of this woman." (Defendant objects to questions and answers; overruled; defendant excepts.)
Dave Burney, the defendant, testified, in part: "Clyde Morgan was messed up with some of them girls there. They call them grown women, but there ain't but two women there except my wife. The rest of them is nothing but children I raised up myself. Clyde Morgan got to putting a whole lot of trouble on me and got to running around and ganging around, you know, and I asked him to cut it out, and he would not do it. I said, `Clyde, this costs me right smart. It costs me about seventy-five dollars for one of the girls' doctor bill, and the child died,' and he wouldn't help me pay a cent of it. It hadn't been long since the child died, but me and Clyde had some words one Saturday. And one Saturday *Page 606 
night I and he had some words about it. He kept on messing with the girls, and I had some words with him about it, and he got to calling me all kinds of sons of bitches, and flatheaded sons of bitches. And he said if anyone said they were his children they lied. And I struck him. . . . And when I saw him with his gun I got mine. That made the third time he had started after me with his gun that morning. He was hiding with his gun on the ditch banks and in the cornfields ever since until this night that the shooting took place. He threatened me. He threatened that Sunday night me and him had words, and then again in Kinston the day the tobacco market opened I saw him in Kinston. He came to me and wanted some money. I let him have five dollars and got after him about throwing his gun after me and cussing me like he did. He said to me, `Uncle Dave, you know I have been going with them girls when I got ready, and that he was going with them right on and kill the hell out of me on top of it.' That's what he said to me in Kinston. He came back with me. . . . I did not buy any shells that day. I did not stop anywhere at any filling station. Orphie Kinsey is a girl I raised. She is a daughter of the woman who was shot. I did not give Clyde Morgan a gun to carry anywhere. He got out at my home. He went on home. I did not have any words with him at my home. I did not have any words on the way home, not a word with him. What happened, happened mostly in town. . . . And I asked her `where have you been, you haven't been home since Saturday night,' and she said she had been with Miss Liza, that she was sick and wanted her to cook for her. And I had a little stick in my hand, and she jumped and ran. . . . And I got Mr. Jesse Jones to take her mother and little brother to go and see if she could find her, if she was at her Uncle Ernest's. But she didn't come back. And I said, `How did she get down there do you reckon?' And she said she walked. And her mother was crying around all that day, and she went to look for her again that evening, and my wife went with her. And she came back with her. And I asked her where she had been, and she said she was at Ernest's. I saw Otis Roberson in Kinston, and he said. And I came back and asked Orphie that same night, said, `Orphie, how is it you said you stayed to your Uncle Ernest's last Sunday.' She said, `I did.' And I said, `You stayed right over there at Phil Otis Roberson's.' And she said she didn't. And I said, `Otis Roberson said you stayed with him, and he carried you down the road Monday morning.' And that's all I know about it, except the shooting. Me and Mordie and this girl goes down the path that night. This girl was going to leave me and go stay with her uncle, and I got a lot of clothes that same day to fix for her to go the next day. And her uncle sent some word by her to me about what arrangements he could make to fix for her. And *Page 607 
we were talking about that, and I got after her about the tales she told me about, the tales she said about staying to her uncle's and she stayed somewhere else. And I grabbed her. And I don't know whether I hit her or not, but she got away from me. I was mad with her about the tales she had told me. I hadn't had a cross word with her mother. When she got away from me we were down the path a little ways, we were near the tobacco barn, one tobacco barn. I went back to the house and Mordie came back to the house. That's the dead woman who came back to the house and after this girl got away from me I came back to the house. And as I came back somebody was standing at the horse lot, and I didn't know who it was, and I took it to be Clyde Morgan, on account of the threats he had been making. It was dark. I couldn't tell who it was. I got my gun and I shot out that way, and that's how that woman got the load in her legs. I didn't know the woman was out there. I went out there and got her and brought her to the house. So far as dragging her, and I may have went out and got her and she walked to the house, and she walked into the hospital when me and Mr. Harris carried her there. I didn't intend to shoot her. Not a cross word have I had with her. I tried to get her a doctor. I done everything in this world that I could, and kept right on working until I got her to the doctor. I don't know a thing in this world about a chair. After I discovered that I had shot Mordie I went out there and got her and brought her back and laid her on the floor on a feather-bed so she could keep cool. . . . I went to the hospital with Mr. Harris. When we carried her to the hospital and put her on the hospital bench the doctor asked her who it was shot her, and I said, `It was me.' That it was an accident, that she was out there and caught the load. And she said the same thing. And he said he thought she would be all right in a week, and to bring sixty dollars with me. And when I came back I got Mr. Harris to go by Mr. Hargett's store to get me eighty dollars that a man owed me. And he was gone to Greenville, with some tobacco. And then I went and gave myself up to the sheriff. . . . Yes, I think I did look at her leg, but I didn't see but one hole in there. I didn't beat her over the head with a chair. It was Saturday when I went to the window and pointed a gun at Orphie, but I didn't say I would blow the day-lights out of her. When I pointed the gun at her I was just messing — that wasn't the first time. I did start to beating her, but she ran. I didn't lay off to have her lay out night after night and get in trouble with the men folks. The trouble I was talking about with Clyde Morgan didn't happen a month before this. It happened about two weeks before. It was all combined together . . . Clyde Morgan was with me, and although I say he threatened to kill me in spite of that, I brought him home, because he didn't have any way to *Page 608 
come home, and I had a great big car, but I ain't give him no gun. When I left with Mordie and Orphie I had started down the path to fix for this girl to get away the next day. Yes, we went towards the tobacco barn, but there are tobacco barns both ways. We were about as far as from here to the back of the courthouse along the path when we started to fighting. I didn't knock her down, and I didn't kick her. I don't know whether I beat her in the face or not. I was so mad with her, I don't know. I was mad because of the way she had had men laying with her, and I was mad with her because she ought to have been at work. Yes, she's grown, and she didn't have a right, if I had to work in the field for her; I wasn't trying to get her to the tobacco barn when she got away, and I say I wasn't mad enough to kill her. I didn't tell the sheriff I was shooting at her, Orphie, not as I know of. I was so worried when I saw that woman that I didn't have good sense. I don't know, sir, whether I told him that or not. My wife and my niece helped me get her in there. We went out there and got her in the house. I picked her up by the arms; she walked to the house with us — walking each side of her, holding her arms. . . . This is not the first time I have been in trouble. I shot a man's ear, and the doctor had to take it off, and it wasn't my fault that I didn't shoot his head off. . . . I don't know how many of the children there are mine, but I take care of them. I have been supporting them, and the other fellow where helped get 'em is not taking care of them. I thought more of Mordie than anybody else out there in the house, except my wife. She wasn't old — only about forty. These younger women were not more attractive, and I didn't think I could get rid of her in this way. I shot that night not knowing who I was shooting at, because Clyde Morgan had been slipping around there and threatening my life with guns for two or three weeks. I was at the barn of the lot; I was between the house and the barns, and I shot and I hit him. I told the sheriff I was shooting at a man, but I didn't shoot at anybody to kill them. And they weren't No. 4 shot; I ain't had any No. 4 shots in my house in years. No, sir, I didn't kill her, she died. I don't know whether the doctor took a shot out of her leg and that Mr. Taylor saw them, and that they are No. 4 shot. They were No. 6's. I swear to that because I didn't buy any other kind. There is as much truth in that as anything else I have said."
Lula May Hall: "I am a niece of Dave Burney. I live there with him. I was at home the night that the shooting occurred. I was there when my Uncle Dave came back from Kinston. In the kitchen. I did not see shooting. I did hear the gun fire. I saw Mordie Kinsey after the shooting, in the house. They brought her to the house. She walked up to the house. She was between mamma and Uncle Dave and Aunt *Page 609 
Fannie. She was put on the floor on a pallet. I stayed with her after that. I waited on her. I did not see my Uncle Dave strike her at any time. . . . I am fifteen years old and had one child that died when it was thirteen months old, and his daddy was Clyde Morgan. That is what I told Dave, and that's what Dave accused him of; Dave was not its daddy. . . . I said I saw Clyde Morgan that night, but didn't see him with a gun."
Carl Foy: "I didn't hear the gun fire on August 25th over at Dave's house. I was asleep, but my wife heard it. That same night Dave Burney came over to my house. He stopped in front of my place, and said to two of my boys for me to come down there. I asked the boy had he been drinking, and they said he had been drinking but was not drunk. I told them my wife was sick, and I couldn't go. One of Mordie's boys asked me if I heard the gun shoot, and I said I didn't, and then he said, `Well, Uncle Dave has shot mamma,' and I told him to go back and look out for himself. Dave Burney caught me before I got to the house. When he called me to come down there my wife told me not to go. She was sick, so I went to the back door and he said, `Come to the road,' and I said, `I ain't,' and he said, `You are scared,' and I said, `No, I ain't scared,' and I said, `Come here.' And he came there to the back and sat down at my feet and talked about ten minutes, and then he said, `Come out here; I have got something to tell you,' and I went about ten steps. I just had on my pants and was barefooted, and he told me, `I shot Mordie.' And I said, `Did you shoot her bad?' And he said, `Yes, from her knees down,' and he didn't say whether it was an accident or not, and he said he wanted to get someone to get her to the hospital. And I said, `You get Mr. Jones and I will do all I can.' He didn't have any car or any other kind of transportation."
The State proved by several witnesses that the general reputation of defendant was bad.
The defendant made numerous exceptions and assignments of error and appealed to the Supreme Court. The material ones and necessary facts will be set forth in the opinion.
At the close of the State's evidence and at the conclusion of all the evidence, the defendant in the court below made motions for judgment of nonsuit. C. S., 4643. The court below overruled these motions and in this we can see no error. The evidence on the part of the State was plenary and abundant to be submitted to a jury as to the defendant's being guilty of murder in the first degree. *Page 610 
Exceptions and assignments of error were made on the trial below to the following questions and answers (which cannot be sustained): When Orphie Kinsey was being examined by the State, the following questions and answers were given: "Q. And that's the reason you are testifying like that? Ans.: No, sir, he didn't ask me anything about this. He just asked me how I was getting along and how were the children. Q. Who else was there? Ans.: Cricket Hobbs. Q. Cricket is another one of his women living there? Ans.: She is a girl that lives there. He raised her and she stays there." This evidence was to explain the reasons why the witness was conversing with defendant. It may be that the question "Cricket is another one of his women living there?" was improper. The answer destroys the imputation, as the witness answered, "She is a girl that lives there. He raised her and she stays there." We cannot hold this as prejudicial or reversible error.
When Clifford Harris, the defendant's employer, was being questioned on cross-examination, the following testimony was admitted: "Q. How many women did he have there? Ans.: Why, there was, let's see, about five, I think, grown women. Q. And all of them have children, haven't they? Ans.: I think so. Q. There are about twenty-odd children around there, are there not? Ans.: Something like that. Q. And they are his, aren't they? Ans.: I don't know, sir. Q. And some of them are kin to him? Ans.: Some of the people staying there are kin to him." When the objection was first made by the defendant it was on the ground that the testimony was not relevant. This evidence was admitted on the ground of motive. The State's evidence was to the effect that defendant had purchased shells with No. 4 shot and had sent the gun to the tobacco barn and had later had Orphie and her mother, Mordie Kinsey, to go down there with him. Defendant was drinking, cursing, and had a fight with Orphie Kinsey. He tore her clothes. The mother went back towards the house and he shot her. Defendant himself, in his testimony, gave the members of his household. Defendant was angered with Orphie, the daughter of the deceased woman. Orphie had left the home. The reason is given in his testimony. It seems that his motive was to control Orphie and her mother who lived with him — he was head of the household of women and children. On the whole we do not think the evidence prejudicial or reversible error.
The following questions were asked Leo Kinsey, a son of the deceased woman: "Q. How long have you lived with Dave Burney? A. I don't know. Q. That was your mamma who was killed? Ans.: Yes. Q. Do you know who your father is? Ans.: No." This evidence is mainly negative and has little, if any, probative force. We see in it no prejudicial or reversible error. *Page 611 
The defendant contends that all of this evidence was prejudicial and was incompetent, reflective of defendant's character under the principle laid down in S. v. Bryant, 189 N.C. 112, and S. v. Shinn, 209 N.C. 22. TheBryant case was decided on the ground that it impinged C. S., 564. At p. 115, it is said: "If we treat the remarks made by the presiding judge to the witnesses, Loudermilk and Henson, as harmless and inadvertences, we are still confronted with the expression, `This witness has the weakest voice or the shortest memory of any witness I ever saw.' — language which was clearly susceptible of any construction that the testimony of the witness was at least questioned by the court, if not unworthy of credit. The fact that exception was not entered at the time the remark was uttered is immaterial. The statute is mandatory, and all expressions of opinion by the judge during the trial, in like manner with the admission of evidence made incompetent by statute, may be excepted to after the verdict. Broom v.Broom, 130 N.C. 562."
In the Shinn case is the following (at pp. 23-4): "S. J. Critz, who had testified as a witness for the defendant, on his cross-examination by the solicitor for the State, testified that he knew the general reputation of the witness, Luther Mesimer, and that it was `pretty good.' He was then asked the following questions by the solicitor for the State: `Q. How many times has Luther Mesimer been up in court? Ans.: Two or three times. Q. In the last six years, hasn't he been involved in affrays with deadly weapons at least half a dozen times, and isn't that his reputation? Ans.: I don't know how many times — several times. Q. Didn't he serve 8 months sentence for an assault with a deadly weapon, to wit: a knife? Ans.: Yes, sir.' The defendant's objections to these questions and the answers thereto, all made in apt time, were overruled, and the defendant excepted." The Court granted a new trial, basing its decision on S. v. Holly,155 N.C. 485. In that case, at p. 490: "Dr. Bell, a witness for the State, testified upon cross-examination that the general character of the defendant was good. Upon the re-direct examination the witness was asked by the State if he had not heard that the prisoner had been accused of killing his wife. The witness answered `Not until after the present charge was brought.' To this question and answer the defendant objected and excepted." At p. 492-3, speaking to the subject, it is said: "If one collateral question of this character can be raised and tried, the same rule would permit a hundred others. The authorities in this State are numerous and uniform that it is error to allow such questions on the cross-examination of a witness as to character. In Barton v. Morphes, 13 N.C. 520, it was held inadmissible to ask `if he had not heard Morton accused of stealing a penknife'; in Luther v. Skeen, 53 N.C. 357, that `there was a current report in the neighborhood that plaintiff had sworn to lies while *Page 612 
living in Randolph'; in S. v. Bullard, 100 N.C. 487, `Do you not know that it was extensively talked about and said that the defendant practiced a fraud upon the firm of Worth Worth?'; in Marcom v. Adams, 122 N.C. 222, `Have you not heard that defendant had committed forgery?', `Do you not know that the defendant had been indicted for forgery?'; and in Coxe v.Singleton, 139 N.C. 362, `Have you not heard that the defendant committed rape on a Negro girl?', `Have you not heard he padded his pay-roll at the mill?'" (At p. 494): "That the evidence was prejudicial cannot be doubted. The prisoner was charged with murdering, by poison, a member of his household, and the evidence was circumstantial. It was calculated to excite feeling against him in the minds of the most intelligent and upright jurors to know that he had been charged with killing his wife."
The evidence in the present case, which was objected to, tended to show motive. It gave the setting. Defendant was head of the household — a tenant with a large force to work the crops. The evidence indicated that he attempted to control Orphie Kinsey, who had left home, and her mother, Mordie Kinsey, the deceased. The defendant practically admitted all the testimony objected to. We cannot hold it prejudicial or reversible.
The defendant contends that the court in its charge did not present for the jury's consideration, manslaughter. The court below gave an accurate charge as to burden of proof, reasonable doubt, malice, premeditation and deliberation; what constituted murder in the first degree, the second degree, and stated fully the evidence and law applicable to the facts on which aspect the jury could return a verdict of not guilty. The evidence and contentions were fairly set forth on both sides of the controversy. The court below charged the jury: "Now, the court instructs you, gentlemen, that under the bill of indictment, and under the evidence offered in support of the bill of indictment, the jury can render one of three verdicts, to wit: guilty of murder in the first degree; guilty of murder in the second degree; or not guilty. There is no evidence to warrant the court in submitting to the jury the question of manslaughter." From a careful review of the evidence which is in the record, without repeating same, we cannot see any element of manslaughter. The facts in this case are distinguishable from the cases of S. v. Kennedy, 169 N.C. 288, and S. v.Robinson, 188 N.C. 784, cited by defendant.
In 4 Warren, Homicides (1938), p. 447, is the following: "Where there is no evidence of passion and where one of two theories only can be accepted by the jury, either that of murder or self-defense, the defendant is not entitled to an instruction on manslaughter," etc. S. v. *Page 613 Byers, 100 N.C. 512; S. v. McKinney, 111 N.C. 683; S. v. Johnson,172 N.C. 920.
In S. v. McKay, 150 N.C. 813 (815), it is written: "The court further instructed the jury that they should return a verdict of murder in the first degree, murder in the second degree, or not guilty. There was no evidence in the case to reduce the crime to manslaughter, and therefore it would have been improper for the judge to have submitted to the jury a view of the case unsupported by any testimony whatever. S. v. Hicks,125 N.C. 636; S. v. White, 138 N.C. 704." S. v. Dixon, ante, 438.
The following exception and assignment of error made by defendant cannot be sustained: "It is largely a question of fact for you gentlemen. If you reject and refuse to accept, to adopt the defendant's theory of the case, and upon all of the evidence in the case you should be satisfied upon the evidence beyond a reasonable doubt that he did shoot the deceased, mistaking her for Orphie Kinsey; that he intended to shoot Orphie Kinsey and to kill her, and if you find that he did it with malice aforethought and with premeditation and deliberation, then the court instructs you that as a matter of law he would be guilty of murder in the first degree, because under the law of this State, where a person with malice aforethought and with premeditation and deliberation intends to kill some particular person, but through mistake kills another, he is just as guilty as if he had killed the person he intended to kill."
In Wharton on Homicide (3rd ed.), part sec. 359, p. 574, is the following, which is well settled law in this jurisdiction: "The rule is nearly, if not quite, universal that one who kills another, mistaking him for a third person whom he intended to kill, is guilty or innocent of the offense charged the same as if the fatal act had killed the person intended to be killed."
In S. v. Sheffield, 206 N.C. 374 (382), speaking to the subject, is the following: "In Wharton's Criminal Law, 12th ed., Vol. 1, part sec. 442, pp. 677-678, we find: `Where A. aims at B. with malicious intent to kill B., but by the same blow unintentionally strikes and kills C., this has been held by authorities of the highest rank to be murder.' S. v. Benton, 19 N.C. 196; S. v. Fulkerson, 61 N.C. 233; S. v. Cole, 132 N.C. 1069."
The court also charged the jury correctly in regard to defendant's testimony in reference to thinking he was shooting at Clyde Morgan, who had made threats against him.
The court charged the jury as follows: "Murder in the first degree is the unlawful killing of a human being with malice aforethought and with premeditation and deliberation. Premeditation means to think about beforehand for some length of time, however short. Deliberation *Page 614 
means to think about, to revolve over in one's mind and weigh. A person forms a purpose to kill another and weighs this purpose in his mind long enough to form a fixed design to kill at a subsequent time, no matter how soon, nor how late. And pursuant to said fixed design kills said person; this would be a killing with premeditation and deliberation. And when done with malice would constitute murder in the first degree. A fixed purpose to kill means preceding the act of killing, although the length of time between the time it is formed and carried into effect is immaterial." Defendant excepted and assigned error, which cannot be sustained. S. v.Bowser, 214 N.C. 249 (253).
In S. v. Dowden, 118 N.C. 1145 (1153), it is said: "If the prisoner weighed the purpose of killing long enough to form a fixed design to kill, and at a subsequent time, no matter how soon or how remote, put it into execution, there was sufficient premeditation and deliberation to warrant the jury in finding him guilty of murder in the first degree. S. v. Thomas,ante, 181; S. v. Norwood, 115 N.C. 790; S. v. Covington, 17 N.C. 834;S. v. McCormac, 116 N.C. 1033. This Court has not followed the intimations of some of the courts of other states that, in order to constitute deliberation, there must be evidence of a definite design formed on some occasion, previous to the meeting at which the killing was done, and cherished up to and at the time of putting it into execution. The court properly told the jury that where the intent to kill was formed simultaneously with the act of killing the homicide was not murder in the first degree. This was but another mode of expressing the rule that there must be a preconceived and definite purpose to kill, the question of the time that elapses between the determination to kill and the killing being immaterial." S. v. Hawkins, 214 N.C. 326 (334).
From the entire record we can find no prejudicial or reversible error. The defendant drinking and maddened by the troubles, or fancied troubles, with Orphie Kinsey and her mother, who were living at his home — Orphie having left his home and come back — purchased No. 4 shells for his gun the evening of the homicide and sent the gun to the tobacco barn loaded. Defendant enticed Orphie and her mother to go to the barn; near the barn defendant and Orphie got into a fight in which he nearly denuded her but she escaped. The mother retreated towards the house and while in the yard defendant shot her as she crouched on the ground. The shot that hit her and from which she died was No. 4. The whole record discloses a "jungle" situation — liquor, women and the sequel murder.
In the judgment of the court below, there is
No error. *Page 615