STATE OF NORTH CAROLINA v. KELLY DEAN SPARKS

No. 26

(Filed 30 August 1974)

1. Constitutional Law § 29; Criminal Law § 135; Jury § 7— jurors opposed to death penalty — excusal for cause

The trial court in a first degree murder case did not err in excusing for cause seven prospective jurors who stated that they could not vote for a verdict that would result in imposition of the death penalty no matter how aggravated the case and regardless of the evidence shown.

2. Homicide § 20— bloody shirt — photograph of deceased — admissibility

In a homicide prosecution, the trial court did not err in permitting the State to introduce into evidence the bloody shirt the victim was wearing when shot and a photograph of the deceased made on an ambulance stretcher since both exhibits corroborated testimony of the State's witnesses and the court properly instructed the jury that the photograph was admitted solely for illustrative purposes.

3. Criminal Law §§ 52, 57; Homicide § 15— expert testimony — use of "could have"

In a homicide prosecution, the trial court did not err in permitting an expert in forensic chemistry to testify that from tests he conducted on defendant's left hand there were indications that defendant "could have" fired a gun.

4. Criminal Law § 102— jury argument — demonstration of weapon firing with handcuffed hands

In a prosecution for the murder of a policeman, the trial court did not abuse its discretion in permitting the district attorney during his jury argument to demonstrate the firing of the weapon with his hands handcuffed behind him to illustrate how the defendant allegedly

killed the deceased where the solicitor's actions were supported by the evidence and did not amount to experimental evidence.

5. **Homicide § 25— first degree murder — failure to instruct on "fixed design"**

The trial court did not err in failing to charge that it was necessary for defendant to have held a "fixed design" to take the life of the deceased in order to be found guilty of first degree murder where the court charged that in order to return a guilty verdict the jury must find that defendant "intended to kill" the deceased.

6. **Homicide § 21— premeditation and deliberation — sufficiency of evidence**

There was sufficient evidence of premeditation and deliberation for submission to the jury of a charge of first degree murder of a policeman where the State's evidence tended to show that the policeman awakened defendant and his three companions who were sleeping in a car, handcuffed defendant and arrested defendant for possessing a sawed-off shotgun, that defendant shot the policeman while he was searching the car, that some 15 minutes had elapsed from the time defendant was awakened until the actual firing of the shot, that the policeman was in uniform and wearing his badge, that defendant with a gun in his hands was observing the policeman over his shoulder immediately before the fatal shot was fired, that after the shot was fired a clicking sound was heard at least twice, that the same sound had been heard the day before when the pistol jammed and failed to fire, that defendant fled and dropped the pistol near the scene of the shooting, that the pistol was jammed when found, and that defendant and his companions were in full control of their faculties despite the use of drugs the preceding day.

7. **Homicide § 14— death from intentional use of deadly weapon — presumptions — constitutionality**

Presumptions of malice and unlawfulness of killing arising from the State's proof that a death was proximately caused by defendant's intentional use of a deadly weapon are not contrary to the constitutional provision that the State has the burden of proving all the elements of the case beyond a reasonable doubt.

8. **Homicide § 8; Criminal Law § 168— mental capacity — drugs — instructions unsupported by evidence — harmless error**

Where there was no evidence that defendant was under the influence of drugs or intoxicants at the time of the fatal shooting, the court's instructions on defendant's contention with reference to mental deficiency brought about by the use of drugs as a defense to first degree murder were more favorable to defendant than he was entitled to receive, and any error or inconsistency in them was harmless to defendant.

9. **Homicide § 30— first degree murder — failure to submit involuntary manslaughter**

In a prosecution for the first degree murder of a policeman wherein all the evidence tended to show that defendant intentionally shot and killed the deceased, there is no merit in defendant's contention that

the trial court should have submitted an issue of involuntary manslaughter on the ground that it is reasonable to suppose that defendant fired a single shot at the policeman for the purpose of temporarily disabling, stunning, or injuring slightly in order to effect his escape from custody.

10. **Constitutional Law § 36; Criminal Law § 135— constitutionality of death penalty**

Imposition of the death penalty is not cruel and unusual punishment in violation of the Eighth Amendment or arbitrary punishment in violation of the Fourteenth Amendment to the U. S. Constitution.

Chief Justice Bobbitt and Justices Higgins and Sharp dissenting as to death sentence.

APPEAL by defendant from *Copeland, S.J.,* at the 29 October 1973 Criminal Session of GUILFORD Superior Court.

On an indictment proper in form, defendant was tried and convicted of murder in the first degree of George L. Lashley. Defendant appeals from a judgment imposing sentence of death.

The State's evidence tends to show that on 29 June 1973 defendant was driving his mother's car around Greensboro, North Carolina. The State's three principal witnesses, Paul Darrell Stone, Paula Rogers, and Robin Diana Phillips (hereinafter referred to as Stone, Paula, and Robin) were with defendant, and the four of them took differing amounts of "speed" at various times during the day. During the afternoon defendant drove his mother's car to a lake near Greensboro, and there defendant and Stone discharged a .25-caliber pistol belonging to defendant several times. Later that day defendant took the two girls, Paula and Robin, to an establishment known as the Jokers 3 in Greensboro. Defendant and Stone then went "riding around." While riding around, defendant spotted a white Mustang automobile and stopped near it. He proceeded to "straight wire" that car and drive off in it, having Stone follow him in the car belonging to defendant's mother. Later they parked defendant's mother's car, and defendant and Stone went back to the Jokers 3 in the Mustang and picked up Paula and Robin. This was sometime between 7:00 and 8:30 p.m.

After driving around Greensboro for awhile in the stolen Mustang, the four started discussing the possibility of going on a trip. They were out of drugs, and defendant suggested they go to Gibsonville and "rob" a particular doctor's office since, according to defendant, this doctor kept a lot of drugs there. The

group agreed to this plan. When they arrived in Gibsonville, they drove by the doctor's office several times. Some people were still on the street nearby, so they decided they would wait until early the next morning before "robbing" the office.

They then went to a restaurant to eat. Afterwards defendant drove the car to a wooded area near the edge of Gibsonville where one of the city's sewer system pump stations was located. There defendant parked and all four fell asleep in the car.

Stone, Paula, and Robin all testified that the four of them had been taking "speed" during the day, but they were out and had gone to Gibsonville to try to get some type of drugs on which to get "high"; and that none of them were "up" on drugs when they went to sleep in the car.

On the front seat of the car next to defendant was a sawed-off shotgun that defendant and Stone had stolen earlier in the day. Defendant also had his .25-caliber pistol under the driver's seat.

Around 6:30 a.m. on the next day Vance Evans, the assistant superintendent of Gibsonville, was checking the various pump stations around the city. He observed the white Mustang near the pump station on city property where no one was authorized to park. He immediately drove to the city hall and reported this to the town's chief of police, George L. Lashley. Evans and Chief Lashley drove to the pump station and parked the police car behind the Mustang. Chief Lashley walked up to the driver's side of the car and observed the sawed-off shotgun in the front seat. He woke defendant, asked him if he did not know that it was illegal to have a sawed-off shotgun, and told him to get out of the car. Chief Lashley then searched and handcuffed defendant, and told him he was under arrest for possessing a sawed-off shotgun.

Stone, Paula, and Robin were awakened by this activity. Stone was ordered out of the car and was searched but not handcuffed—apparently because Lashley had only one pair of handcuffs. Next, at the direction of Lashley, Paul and Robin got out of the car. Chief Lashley then searched the car, beginning with the driver's side. He removed several items from the driver's side of the car, placed them on top of the car, and then walked in front of the car to the passenger's side. Lashley left the door on the driver's side open, and as he walked toward the other side of the car, defendant moved from a position at the

State v. Sparks

rear of the car up to the driver's side by the open door where Lashley had just been. Meanwhile Chief Lashley was searching the passenger's side and was leaning forward with his shoulder inside the car. As Lashley was going through a paper bag on the front floorboard, defendant was seen to suddenly "move up in the doorway and turn around and look over his shoulder, and then kind of squat." Then a shot was fired, followed by two clicking sounds. Lashley screamed, grabbed his shoulder, and fell backwards.

Immediately after the shot and the clicks, defendant ran from the scene of the shooting into some nearby woods, dropping a pistol from his handcuffed hands as he ran. Stone and Evans quickly tried to assist Chief Lashley who was bleeding badly. When an ambulance arrived a few minutes later, Lashley was dead. According to medical testimony, the bullet went through the second rib on the right side, the upper and lower parts of the right lung, the aorta, and then lodged in the abdominal cavity near the pancreas.

A .25-caliber pistol identified as belonging to defendant was found by investigating officers in some grass where one of the State's witnesses had seen defendant drop a pistol as he fled the scene.

Other facts pertinent to decision are set out in the opinion.

Defendant did not testify or offer any evidence.

*Attorney General Robert Morgan and Assistant Attorney General Thomas B. Wood for the State.*

*Smith, Carrington, Patterson, Follin & Curtis by Norman B. Smith for defendant appellant.*

MOORE, Justice.

[1]  Defendant first contends that the court erred in excusing prospective jurors for cause due to their scruples against capital punishment.

The parties stipulated:

"Seven jurors were challenged by the State and excused by the Court for cause upon the grounds that they possessed conscientious scruples against the imposition of capital punishment and because of these views would not consider any verdict that would involve the death penalty, would not

under any circumstances return a verdict that would involve the death penalty regardless of what the facts of the case showed or what the evidence might reveal, and were irrecovably committed to vote against any verdict that would involve the death penalty regardless of what the circumstances were or how aggravated the case was."

Since *Witherspoon v. Illinois*, 391 U.S. 510, 20 L.Ed. 2d 776, 88 S.Ct. 1770 (1968), this Court has consistently held that if a prospective juror states that under no circumstances could he vote for a verdict that would result in the imposition of the death penalty no matter how aggravated the case and regardless of the evidence shown, the trial court can properly dismiss the juror upon a challenge for cause. *State v. Fowler*, 285 N.C. 90, 203 S.E. 2d 803 (1974); *State v. Noell*, 284 N.C. 670, 202 S.E. 2d 750 (1974); *State v. Anderson*, 281 N.C. 261, 188 S.E. 2d 336 (1972); *State v. Watson*, 281 N.C. 221, 188 S.E. 2d 289 (1972); *State v. Cook*, 280 N.C. 642, 187 S.E. 2d 104 (1972); *State v. Westbrook*, 279 N.C. 18, 181 S.E. 2d 572 (1971); *State v. Dickens*, 278 N.C. 537, 180 S.E. 2d 844 (1971); *State v. Atkinson*, 275 N.C. 288, 167 S.E. 2d 241 (1969).

In view of the stipulation entered into by the parties, the seven jurors were properly excused for cause. This assignment of error is overruled.

[2] Defendant next contends that the court erred in permitting the State to introduce in evidence the bloody shirt which Chief Lashley was wearing when shot, and State's Exhibit No. 18, a photograph of the deceased made on an ambulance stretcher.

Defendant by his plea of not guilty denied that he fired the lethal weapon or directed its aim. The evidence of the blood-stained shirt and the photograph of the body of the deceased corroborated the testimony of the State's witnesses already in the record. The location of the blood upon the victim's shirt and the photograph of the body and the wound would indicate the angle of the bullet which struck the victim and the direction from which it was fired. These also indicated an overhead shot from the opposite side of the car from where the victim was standing, and corroborated the witnesses' testimony that such was the location of defendant at the time the pistol was fired.

" ' * * * In cases of homicide or other crimes against the person, clothing worn by the defendant or by the victim is admissible if its appearance throws any light on the cir-

cumstances of the crime * * * . ' Stansbury, North Carolina Evidence, 2d Ed., § 118; *State v. Rogers,* 275 N.C. 411, 430, 168 S.E. 2d 345; *State v. Atkinson,* 275 N.C. 288, 310, 167 S.E. 2d 241; *State v. Speller,* 230 N.C. 345, 53 S.E. 2d 294; *State v. Petry,* 226 N.C. 78, 36 S.E. 2d 653." *State v. Felton,* 283 N.C. 368, 196 S.E. 2d 239 (1973).

The court properly instructed the jury that the photograph was admitted solely for the purpose of illustrating and explaining the testimony of the witnesses and not as substantive evidence. Under such circumstances, the fact that the photograph depicts a gruesome or gory spectacle does not render it inadmissible. *State v. Robinson,* 283 N.C. 71, 194 S.E. 2d 811 (1973); *State v. Frazier,* 280 N.C. 181, 185 S.E. 2d 652 (1972); *State v. Chance,* 279 N.C. 643, 185 S.E. 2d 227 (1971); *State v. Atkinson, supra.* See 2 Strong, N. C. Index 2d, Criminal Law §§ 42, 43 (1967).

[3] Defendant next contends that it was error to permit an expert chemist to testify for the State that defendant "could have" fired the pistol instead of limiting the witness's testimony to whether defendant probably discharged the weapon.

Mr. R. D. Cone, who was qualified as an expert forensic chemist specialized in the field of physical evidence, testified that from the tests he had conducted on defendant's left hand there were indications that defendant "could have" fired a gun. Defendant contends that this statement does not meet the tests as set out in *Lockwood v. McCaskill,* 262 N.C. 663, 138 S.E. 2d 541 (1964), and that the opinion of the expert witness should have been to the effect that it was "reasonably probable" that the defendant fired the gun.

In *Apel v. Coach Co.,* 267 N.C. 25, 147 S.E. 2d 566 (1966), this Court approved questions where expert witnesses were asked their opinion as to whether the accident which was the subject of the suit "could or might have" resulted in the type of disability alleged by the plaintiff.

In *Mann v. Transportation Co.* and *Tillett v. Transportation Co.,* 283 N.C. 734, 747, 198 S.E. 2d 558, 567 (1973), a mechanic testifying as to a defect in a bus, stated that this defect "could or might have caused the steering system to fail when Gibbs

attempted to steer the bus around the left curve." Justice Sharp in commenting on this testimony stated:

"It is apparent that, in phrasing the hypothetical question which elicited the foregoing opinion from Jeffries, counsel was observing the rule stated in 1 Stansbury, North Carolina Evidence § 137, at 453 (Brandis Rev. 1973), that if the question relates to cause and effect an expert witness 'should be asked whether in his opinion a particular event or condition, *could* or *might* have produced the result in question, not whether it *did* produce such result.' This form of question clearly invited the argument, which Coach Company makes, that *could* or *might have* in Jeffries' answers amounts to nothing more than his speculation as to possibilities. The situation here produced demonstrates the validity of Professor Henry Brandis' comment that an expert witness should be allowed 'to make a positive assertion of causation when that conforms to his true opinion, reserving "could" and "might" for occasions when he feels less certainty'; that if the expert witness, 'though holding a more positive opinion, is forced to adopt the "could" or "might" formula, then the result is patently unjust, unless the more positive opinion may be said to be inherently incredible.' 1 Stansbury, North Carolina Evidence § 137, at 455 & n. 97 (Brandis Rev. 1973). *See also* the comment of Justice Higgins in *Apel v. Coach Co.*, 267 N.C. 25, 30, 147 S.E. 2d 566, 569-70 (1966). Cf. *Service Co. v. Sales Co.*, 259 N.C. 400, 414, 131 S.E. 2d 9, 20 (1963)."

Although in this case the witness Cone should have been allowed to give a more positive opinion, if he had one, it was not error to allow this expert witness to testify that the defendant "could have fired a gun with his left hand."

[4] During the course of the argument by the district attorney, the following proceedings were had:

"THE COURT: The Court Reporter is present, and at this time let the record show that the District Attorney proposes to argue the case to the jury about his contention about the evidence in the case by way of having the handcuffs which are in evidence and identified as State's Exhibit 9 placed on his hands and that he proposes to demonstrate to the jury the manner in which the State of North Carolina contends the alleged murder took place. To this demonstra-

tion, counsel for the defendant objects and excepts to the demonstration. The objection is overruled, with this admonition to the jury:

"That you will take the evidence from the witnesses on the stand and the evidence that was offered here in this courtroom, as you recall it, as it came from the witnesses on the stand and the evidence that was offered and shown to you. Both the District Attorney and counsel for the defendant have a right under the law to argue their contentions about what evidence tends to show. You will bear that in mind at all times as to this demonstration about to be given, and all other arguments that the District Attorney makes and all arguments that counsel for the defendant makes.

"Proceed."

Defendant contends that the court committed reversible error by allowing the district attorney to demonstrate the firing of the weapon with his hands handcuffed behind him to illustrate how the defendant allegedly killed the deceased, for the reason that this demonstration amounted to experimental evidence which was given by argument of counsel and not through a witness under oath.

Defendant cites *State v. Williams*, 168 N.C. 191, 83 S.E. 714 (1914), and *State v. Eagle*, 233 N.C. 218, 63 S.E. 2d 170 (1951), in support of his contention that the solicitor's argument was improper. In *Williams* counsel for defendant "proposed to take some disinterested person in the courtroom and demonstrate before the jury on that person the positions that defendant and the deceased were in at the time of the shooting, as testified to by defendant, in order to show that the wounds would have been inflicted in the body of the deceased at the place and would have had the range or direction which they had, as testified to by the doctors." The defendant, while on the stand as a witness in his own behalf, demonstrated before the jury the position he, the defendant, was in and the position the deceased was in and the way the deceased had hold of him when he fired the shots. This Court stated it could not see how defendant had been deprived of any of his substantial rights by the trial court's refusal to allow defendant's counsel to make the suggested demonstration. The Court then stated:

"The defendant was permitted to make his demonstration before the jury as a part of his evidence, and it then

became the duty and right of counsel to comment on the evidence, but *not to introduce new elements.* Matters of this kind are left to the sound discretion of the presiding judge." (Emphasis added.)

In *Eagle* the solicitor in his argument to the jury exhibited an unidentified bottle of whiskey which had not been introduced in evidence. This Court in holding this action erroneous stated:

> "If in the opinion of the Solicitor the ends of justice required the exhibition to the jury of the bottle of whiskey taken from the defendant's car at the time of his arrest, the bottle should have been identified and introduced in evidence at the proper time during the course of the trial, or a motion made to reopen the case and permit its identification and introduction in evidence. [Citations omitted.]"

In both *Williams* and *Eagle* the demonstrations before the jury involved matters not in evidence. In the present case the State offered evidence that (1) defendant and the deceased were at opposite sides of the car, the defendant standing near the front door on the driver's side with his hands handcuffed behind him, while the victim was bending down on the passenger's side searching the front seat of the car; (2) defendant was looking over his shoulder at a time immediately preceding the shooting with his manacled hands pointing toward the victim; (3) defendant had a pistol in his hands immediately before and after the shooting, and burned gunpowder concentrations were found near the belt loops on the back of defendant's trousers; and (4) the position of the wound upon the victim's body indicated that he was shot by someone standing above, shooting in a direction toward his head—the position in which defendant was last seen immediately before the fatal shot was fired.

From this evidence it was proper to infer that the defendant inflicted the fatal injury in the way demonstrated by the solicitor. His actions were supported by the evidence.

As stated in *State v. Rose,* 270 N.C. 406, 411, 154 S.E. 2d 492, 496 (1967):

> " 'The manner of conducting the argument of counsel, the language employed, the temper and tone allowed, must be left largely to the discretion of the presiding judge.' *S. v. Bryan,* 89 N.C. 531. Ordinarily, this Court 'will not review his discretion unless it is apparent that the impro-

priety of counsel was gross and well calculated to prejudice the jury.' *S. v. Baker,* 69 N.C. 147; *S. v. Bowen,* 230 N.C. 710, 55 S.E. 2d 466, and cases cited; *S. v. Smith, supra* [240 N.C. 631, 83 S.E. 2d 656]; *S. v. Barefoot,* 241 N.C. 650, 86 S.E. 2d 424."

See also *State v. Westbrook, supra.*

No abuse of discretion is shown. This assignment of error is without merit.

[5]   Defendant alleges that reversible error was committed by the court in failing to charge that it was necessary for defendant to have held a "fixed design" to take the life of the deceased in order to be found guilty of first degree murder. He cited *State v. Brown,* 218 N.C. 415, 11 S.E. 2d 321 (1940); *State v. Burney,* 215 N.C. 598, 3 S.E. 2d 24 (1939); and *State v. Spivey,* 132 N.C. 989, 43 S.E. 475 (1903), for the proposition that the "fixed design" definition of intention to kill was a proper part of the standard definition of this element of first degree murder. The definition of first degree murder as contained in those cases was held to be correct, but it is not necessary that the words "fixed design" always be included in defining murder in the first degree. Murder in the first degree is the unlawful killing of a human being with malice and with premeditation and deliberation. A specific intent to kill is a necessary constituent of the elements of premeditation and deliberation in first degree murder. *State v. Duncan,* 282 N.C. 412, 193 S.E. 2d 65 (1972); *State v. Robbins,* 275 N.C. 537, 169 S.E. 2d 858 (1969); *State v. Propst,* 274 N.C. 62, 161 S.E. 2d 560 (1968); *State v. Downey,* 253 N.C. 348, 117 S.E. 2d 39 (1960).

In the present case the trial court in its final mandate to the jury stated:

"So I charge you that if you find from the evidence and beyond a reasonable doubt that on or about June 30, 1973, Kelly Dean Sparks intentionally shot and killed George L. Lashley with a .25 caliber pistol, it being a deadly weapon, thereby proximately causing George L. Lashley's death, and that Kelly Dean Sparks intended to kill George L. Lashley and that he acted with malice and with premeditation and deliberation, it would be your duty to return a verdict of guilty of first degree murder."

The phrase "that he intended to kill" is self-explanatory, and, absent a special request for instructions from the defendant, the

presiding judge was not required to supply its definition. As stated by Chief Justice Stacy in *State v. Plemmons*, 230 N.C. 56, 52 S.E. 2d 10 (1949): "The jury could hardly have failed to understand what was meant by the expression 'with intent to kill.' It is self-explanatory. There is no point in elaborating the obvious." See *State v. Jennings*, 276 N.C. 157, 171 S.E. 2d 447 (1970); 3 Strong, N.C. Index 2d, Criminal Law § 113, p. 14 (1967). This assignment of error is overruled.

[6] Defendant next contends that there was not sufficient evidence to submit the charge of murder in the first degree to the jury because of lack of evidence of premeditation and deliberation.

This assignment raises the question whether the evidence for the State, taken as true and considered in the light most favorable to the State, is sufficient to permit the jury to make a legitimate inference and finding that defendant, after premeditation and deliberation, formed the fixed purpose to kill Chief Lashley and thereafter carried out that purpose. *State v. Van Landingham*, 283 N.C. 589, 197 S.E. 2d 539 (1973); *State v. Perry*, 276 N.C. 339, 172 S.E. 2d 541 (1970). Premeditation and deliberation are not usually susceptible to direct proof, but must be established from the circumstances surrounding the homicide. *State v. Walters*, 275 N.C. 615, 170 S.E. 2d 484 (1969); *State v. Faust*, 254 N.C. 101, 118 S.E. 2d 769, 96 A.L.R. 2d 1422, cert. den. 368 U.S. 851, 7 L.Ed. 2d 49, 82 S.Ct. 85 (1961).

The evidence in this case tends to show that defendant had had a full night's sleep before being awakened and handcuffed by Chief Lashley; that he and his companions were in full control of their faculties despite their use of drugs on the preceding day; that some 10 to 15 minutes elapsed from the time defendant was awakened and ordered from the car until the actual firing of the shot; that Chief Lashley was in uniform and was wearing his badge on this occasion; that defendant with a gun in his hands was observing Chief Lashley over his shoulder immediately before the fatal shot was fired; and that after the shot was fired a clicking sound was heard at least twice—the same sound that had been heard the day before when the pistol "jammed" and failed to fire. Immediately after the shot was fired, defendant ran dropping the pistol near the scene of the shooting. When the pistol was found, it was "jammed" with a shell partially in the barrel.

The want of provocation, the absence of any excuse or justification for the shooting, the number of shots fired or attempted to be fired, the fact that defendant ran immediately after the shooting, coupled with the other evidence, permitted a legitimate inference of premeditation and deliberation, and was sufficient to be submitted to the jury on the issue of murder in the first degree. *State v. Van Landingham, supra; State v. Duncan, supra; State v. Perry, supra; State v. Faust, supra; State v. Lamm,* 232 N.C. 402, 61 S.E. 2d 188 (1950).

[7] Defendant next avers that the court committed reversible error by instructing the jury that if the State proves beyond a reasonable doubt that defendant intentionally killed Lashley with a deadly weapon or intentionally inflicted a wound upon Lashley with a deadly weapon that proximately caused his death, the law raises two presumptions; first, that the killing was unlawful, and second, that it was done with malice. In support of this contention, defendant cites *Re Winship,* 397 U.S. 358, 25 L.Ed. 2d 368, 90 S.Ct. 1068 (1970) ; *Speiser v. Randall,* 357 U.S. 513, 2 L.Ed. 2d 1460, 78 S.Ct. 1332 (1958). Neither of these cases is pertinent to the facts in this case.

Defendant in his brief states:

> "The instructions complained of here are consistent with the well-settled case law of this state. Malice and unlawfulness of the killing are presumed, when a deadly weapon is intentionally used. 4 Strong Index 2d, Homicide, Sec. 14, pp. 207-209. The burden is upon the defendant to disprove malice and reduce a killing to voluntary manslaughter. *State v. Absher,* 226 N.C. 656, 40 S.E. 2d 26 (1946) ; *State v. Alston,* 214 N.C. 93, 197 S.E. 719 (1938)."

Defendant contends, however, that these long-standing rules are no longer valid and are contrary to the constitutional provision that the State has the burden of proving all the elements of the case beyond a reasonable doubt. He cites *State v. Cuevas,* 488 P. 2d 322 (Haw. 1971), in which the Supreme Court of Hawaii invalidated a statute that placed the burden on defendant to show malice was not present or that there was legal justification or extenuation in a killing, stating: "Under our legal system, the burden is always on the prosecution to establish every element of crime by proof beyond a reasonable doubt, never upon the accused to disprove the existence of any necessary element." Defendant contends that that decision ought to

be followed by this Court. We have carefully considered defendant's argument that we should change our well-established rule. However, we are not persuaded to do so. See *State v. Jennings, supra; State v. Propst, supra.*

[8]    There is evidence tending to show that on 29 June 1973 defendant and his companions took differing amounts of "speed" at various times during the day. That night they ran out of drugs and planned to rob a doctor's office in Gibsonville. However, they did not do so, and, according to the three persons who were with defendant, none of them were "up" on drugs when they went to sleep in the car that night nor when they awakened the next morning. The defendant did not testify or offer any evidence.

Although there was no evidence that defendant was under the influence of drugs or intoxicants at the time of the fatal shooting, the trial judge, out of an abundance of caution and at the request of defendant, instructed the jury on defendant's contention with reference to mental deficiency brought about by the use of drugs as a defense to first degree murder. These instructions were all more favorable to defendant than he was entitled to receive, and if there was error or inconsistency in them, it was harmless to defendant.

[9]    Defendant next avers that the court committed reversible error by failing to submit the crime of involuntary manslaughter, contending that it is reasonable to suppose that defendant fired a single shot at the police officer only for the purpose of temporarily disabling, stunning, or injuring slightly, in order to effect his escape from custody.

There is no evidence to support this contention. All the evidence tends to show that defendant intentionally shot and killed Chief Lashley. "The necessity for instructing a jury as to an included crime of lesser degree than the one charged arises only when there is evidence to support the included crime of lesser degree. *State v. Watson,* 283 N.C. 383, 196 S.E. 2d 212; *State v. Bryant,* 280 N.C. 551, 187 S.E. 2d 111; *State v. Carnes,* 279 N.C. 549, 184 S.E. 2d 235." *State v. Henderson,* 285 N.C. 1, 22, 203 S.E. 2d 10, 24 (1974). See also *State v. Bunn,* 283 N.C. 444, 196 S.E. 2d 777 (1973); *State v. Freeman,* 275 N.C. 662, 170 S.E. 2d 461 (1969). This assignment of error is overruled.

**[10]** Finally, defendant contends that the imposition of the death penalty in this State is cruel and unusual punishment in violation of the Eighth Amendment and arbitrary punishment in violation of the Fourteenth Amendment to the United States Constitution.

Defendant admits that this Court has rejected this argument in *State v. Jarrette*, 284 N.C. 625, 202 S.E. 2d 721 (1974). We adhere to our decision in that case. See *State v. Fowler*, 285 N.C. 90, 203 S.E. 2d 803 (1974); *State v. Dillard*, 285 N.C. 72, 203 S.E. 2d 6 (1974); *State v. Crowder*, 285 N.C. 42, 203 S.E. 2d 38 (1974); *State v. Henderson, supra; State v. Noell*, 284 N.C. 670, 202 S.E. 2d 750 (1974); *State v. Waddell*, 282 N.C. 431, 194 S.E. 2d 19 (1973).

Because of the imposition of the death sentence, we have carefully examined the entire record in this case, including the charge of the court, and have considered every contention and argument advanced by defendant. Our examination discloses that defendant received a fair trial, free from prejudicial error.

No error.

Chief Justice BOBBITT, Justice HIGGINS and Justice SHARP dissent as to death sentence and vote to remand for imposition of a sentence of life imprisonment for the reasons stated in the dissenting opinion of Chief Justice Bobbitt in *State v. Jarrette*, 284 N.C. 625, 666, 202 S.E. 2d 721, 747 (1974).